**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Saundra PRESCOTT,**
**Defendant-Appellant.**

**No. 77–2574.**

United States Court of Appeals,
Ninth Circuit.

Sept. 14, 1978.

Rehearing Denied Nov. 9, 1978.

Michael H. Weiss, San Francisco, Cal., for defendant-appellant.

Lawrence Edelman, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before DUNIWAY, CUMMINGS,* and SNEED, Circuit Judges.

DUNIWAY, Circuit Judge:

In this case we decide two principal questions. One is whether, when the police have probable cause to believe (a) that a person has committed a felony and (b) that he is in a particular house, they may forcibly enter and search for and seize him without first obtaining a warrant, in the absence of exigent circumstances. The second is whether, and if so to what extent, a refusal by the occupant of a house to admit the police, when they do not have a warrant, may be used against the occupant, when she is charged with assisting a federal offender in order to hinder or prevent his apprehension in violation of 18 U.S.C. § 3, which defines an accessory after the fact. Our answer to the first question is that a warrant must be obtained. Our answer to the second question is that the refusal may not be used.

## I. FACTS

In early 1977, federal agents investigating a mail fraud scheme concluded that one Duvernay was using stolen credit cards to obtain merchandise by mail. On January 13, 1977, Postal Inspector Russell supervised a controlled delivery to 551 Grove Street, San Francisco, one of several addresses employed by Duvernay, of three parcels containing clothing and electronic calculators ordered in this fraudulent manner. Before starting the delivery, Inspector Russell obtained a search warrant· for 546 Grove Street, Duvernay's apartment. He did not, however, obtain a warrant for Duvernay.

546 Grove Street is located on the upper floor of a two-story building which also contains apartments numbered 540, 542 and 544 Grove. On January 13, the day of the controlled delivery, 540 Grove was boarded up and 542, the adjacent apartment on the lower floor, was vacant. 544 Grove, the apartment next door to 546 on the upper floor, was occupied by the appellant, Saundra Prescott, her friend James Johnson, and her young daughter.

Early on the morning of the 13th, a team composed of a dozen federal agents and local police officers placed the entire 500 block of Grove Street under ·surveillance. At approximately noon, a United Parcel Service truck arrived in the area. In it were nine packages, three of which were those that had been specially prepared for the controlled delivery to Duvernay. He appeared, signed for all of the packages on the sidewalk, and then, with the aid of two friends, carried the packages into the building at 540/542/544/546 Grove Street. After delaying a few minutes to interview the truck driver and check the signature on the receipt, a group of officers followed.

Upon entering the building, the officers headed straight for 546 Grove, assuming that Duvernay would be found in his own apartment. To their surprise, they found that the front door to 546 had been padlocked from the outside. Realizing that Duvernay could not have entered the apartment and padlocked the door behind him, they then proceeded to search elsewhere. After ascertaining that Duvernay was not hiding in 542, the vacant apartment on the lower floor, some of the officers ran around to the back of the building and entered 546 through the rear door. Duvernay was not there. Inspector Russell, meanwhile, went to 544 and knocked on the front door. Prescott responded. Russell identified himself as a postal inspector and told Prescott that he was looking for her next-door neighbor. Prescott lied, saying that no one was in the apartment except her husband, her daughter, and herself. In fact, Duvernay had appeared with the packages in hand only minutes before and Prescott had voluntarily admitted him to her apartment.

* The Honorable Walter J. Cummings, United States Circuit Judge for the Seventh Circuit, sitting by designation.

Russell left for a few minutes to confer with the officers who had searched 546. Having satisfied himself that Duvernay was not there, Russell returned to 544 with Officer Foley of the San Francisco Police Department. This time the two knocked at the back door and Prescott again responded. Communicating through a glass pane in the closed door, which Prescott declined to open, Russell and Foley identified themselves, displayed their credentials, and announced that they were looking for Duvernay. Prescott stated, "I don't know the person next door. We have only been here a short while." Russell exhibited a mug shot of Duvernay and informed Prescott that Duvernay was wanted for mail fraud. Again Prescott insisted that no one was in the apartment except her husband, who was sleeping, and her daughter, who was ill. Russell then told Prescott that she could be guilty of an offense if she were harboring Duvernay and asked permission to search the apartment. Prescott asked, "Do you have a warrant?" and Russell replied that he did not. Prescott said nothing in response but steadfastly declined to unlock her door.

At this point, Russell and Foley left and searched briefly for Duvernay elsewhere. Finding nothing, they returned to the back door of 544 and told Prescott that they wished to speak to her husband. She agreed and returned a few minutes later with James Johnson, who identified himself as James Prescott. Russell and Foley told Johnson that they were looking for Duvernay and again requested permission to search the apartment. Johnson refused.

Russell and Foley then telephoned the United States Attorney's Office to ask for advice. At the conclusion of the conversation they returned and told Johnson that if the door were not unlocked in three seconds, they would enter the apartment forcibly. Johnson did not unlock the door and on the count of three the officers kicked it in. They immediately located Duvernay inside. Nine packages, including the three prepared for the controlled delivery, were also found. All of the packages had been opened and many of the mailing labels had been removed. Fragments of partially burned labels were found floating in the toilet bowl.

Prescott was charged as an accessory after the fact, and convicted.

## II. VALIDITY OF THE INDICTMENT

Prescott claims that the evidence presented to the Grand Jury was insufficient to warrant her indictment. The Grand Jury proceedings were not transcribed; hence there is nothing in the record to show what evidence the government did, or did not, present. Prescott merely speculates.

■ An indictment, regular on its face and returned by a legally constituted and unbiased Grand Jury, is presumed to be founded upon sufficient evidence, and a heavy burden is placed upon one who challenges this presumption of validity, *Martin v. United States*, 9 Cir., 1964, 335 F.2d 945, 949. Prescott's showing is plainly insufficient.

## III. A WARRANT IS REQUIRED

Prescott moved to suppress all fruits of the entry into her apartment, including all evidence that Duvernay and his packages had been found inside, because the officers had neither a warrant nor an excuse for not obtaining one. The district judge denied the motion. He took the view that the officers needed no warrant to enter the apartment because they had probable cause to arrest Duvernay and to believe that he was inside. Believing, as he did, that a warrant was not required in any event, the district judge took no evidence, and made no ruling, on the issue of exigent circumstances. "Forget the exigent business," he told defense counsel, who attempted to argue that the officers could have obtained a warrant quickly and easily, without creating an undue risk that evidence would be destroyed or that Duvernay would flee. "It seems to me that they had probable cause to arrest Mr. Duvernay . . . I believe they could come in there and get him and I'm not really much impressed with the facts." R.T. 31.

■ The court cited section 844 of the California Penal Code as supporting his view that no warrant was required. That statute, which requires a peace officer desiring to effect an arrest inside a dwelling to demand admittance and explain his purpose before forcibly entering, assumes a lawful entry and does not purport to excuse, in all situations the failure to first obtain a warrant. In any event, federal law, not state law, is controlling here on the question of whether a warrantless search or seizure is lawful. To the extent that he based his ruling on the California statute, the district judge was therefore in error.

Because the district court declined to rule on the issue of exigent circumstances and because the evidence adduced at the suppression hearing is insufficient to permit us to do so, we are squarely presented on this appeal with the question of whether, absent an emergency, police officers who have probable cause to arrest one whom they reasonably believe to be in a dwelling may enter the dwelling without a warrant in order to carry out the arrest.

The Supreme Court has never resolved this issue. It has held that police need no warrant to arrest a felony suspect on probable cause in a public place; *United States v. Watson*, 1976, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598; *United States v. Santana*, 1976, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300. However, the Court has expressly reserved, on numerous occasions, the "grave constitutional question" of whether an "entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment." *Jones v. United States*, 1958, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514; *See also, United States v. Watson, supra*, 423 U.S. at 418, fn. 6, 96 S.Ct. 820; *Gerstein v. Pugh*, 1975, 420 U.S. 103, 113, n.13, 95 S.Ct. 854, 43 L.Ed.2d 54; *Coolidge v. New Hampshire*, 1971, 403 U.S. 443, 477–81, 91 S.Ct. 2022, 29 L.Ed.2d 564. In *Coolidge* the Court stated in *dicta* that "the notion that the warrantless entry of a man's house in order to arrest him on probable cause is *per se* legitimate is in fundamental conflict with the basic principle of Fourth Amendment law that searches and seizures inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined 'exigent circumstances.'" 403 U.S. 477–78, 91 S.Ct. 2044.

This Circuit has never decided the question either. *United States v. Flickinger*, 9 Cir., 1978, 573 F.2d 1349 at p. 1353; *United States v. Masterson*, 9 Cir., 1976, 529 F.2d 30, 31; *United States v. McLaughlin*, 9 Cir., 1975, 525 F.2d 517, 520, *cert. denied*, 1976, 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198; *United States v. Bustamante-Gamez*, 9 Cir., 1973, 488 F.2d 4, 8, *cert. denied*, 1974, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559. While we have stated in *dicta* that the warrant requirement "is applicable not only in cases of entry to search for property, but also in cases of entry to arrest a suspect," *United States v. Phillips*, 9 Cir., 1974, 497 F.2d 1131, 1135, and *see United States v. Calhoun*, 9 Cir., 1976, 542 F.2d 1094, 1102–103, we have never before so held.

In his opinion for the Court in *Katz v. United States*, 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, Mr. Justice Stewart says that "the Fourth Amendment protects people, not places," *id.* at 351, 88 S.Ct. at 511. But the Amendment itself gives special emphasis to the protection of people in their houses: "The right of the people to be secure in their persons, houses . . . against unreasonable searches and seizures, shall not be violated . . . ." The singling out of "houses" suggests that the draftsmen were especially anxious to safeguard "the sanctities of a man's home and the privacies of life." *Boyd v. United States*, 1886, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746.

This is consistent with the emphasis placed upon the sanctity of the home in England immediately before the revolution, which is well exemplified in Mr. Justice Brennan's opinion in *Miller v. United States*, 1958, 357 U.S. 301, at 307, 78 S.Ct. 1190, at 1194, 2 L.Ed.2d 1332.

Remarks attributed to William Pitt, Earl of Chathan, on the occasion of debate in Parliament [in 1763] on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle:

> "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!"

(footnote omitted)

It was on the same occasion that Pitt said, "Every man's house [is] his castle." *id.*, fn. 7.

It is thus not surprising that the Court has long recognized that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. United States District Court*, 1972, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, and has traditionally "afforded the most stringent Fourth Amendment protection" to the sanctity of private dwellings. *United States v. Martinez-Fuerte*, 1976, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116. Only exceptional circumstances have been held sufficient to justify a search conducted inside a private home without judicial authorization. "[T]he Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing . . that the exigencies of the situation made that course imperative." *McDonald v. United States*, 1948, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153. "When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not a policeman or Government enforcement agent." *Johnson v. United States*, 1948, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436.

■ Had the officers in this case arrested Duvernay on the street, and then entered Prescott's apartment solely to search for the packages, their certainty that the objects they sought would be found within would not have excused their failure to obtain a warrant. Had they gazed through a window and observed the packages lying on a table, in plain sight, they would nonetheless have been obliged to submit their evidence to a magistrate for his disinterested determination that intrusion was necessary. "Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant." *Agnello v. United States*, 1925, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145. "Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the [Fourth] Amendment to a nullity and leave the people's homes secure only . in the discretion of police officers." *Johnson v. United States, supra*, 333 U.S. at 14, 68 S.Ct. at 369.

■ The sanctity of the home is no less threatened when the object of police entry is the seizure of a person, rather than a thing. A magistrate's disinterested determination that governmental intrusion is warranted is no less desirable when the policeman's quarry is a suspect, rather than a piece of evidence.

As the California Supreme Court has noted, it would he thoroughly incongruous "to pay homage to the considerable body of law that has developed to protect an individual's belongings from unreasonable search and seizure in his home, and at the same time assert that identical considerations do not operate to safeguard the individual himself in the same setting." *People v. Ramey*, 16 Cal.3d 263, 275, 127 Cal.Rptr. 629, 636, 545 P.2d 1333, 1340 (*in banc*), *cert. denied*, 1976, 429 U.S. 929, 97 S.Ct. 335, 50 L.Ed.2d 299. This reasoning is equally applicable when it is a third person, present in the home with the householder's consent, for whom the police are looking. The Third Circuit is of the opinion that in such a case a search warrant, not just an arrest warrant is required. *Government of Virgin Islands v.*

*Gereau*, 3 Cir., 1974, 502 F.2d 914 at 928. We think, however, that the distinction between a search warrant and an arrest warrant is an artificial one. The Fourth Amendment makes no such distinction. It provides:

> [N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The warrant, whatever it be called, must describe "the place to be searched," here apartment 544, and "the persons or things to be seized," here Duvernay and the parcels.

■■ We join the District of Columbia Circuit, *Dorman v. United States*, 1970, 140 U.S.App.D.C. 313, 435 F.2d 385 (*in banc*), and the Second Circuit, *United States v. Reed*, 572 F.2d 412, 1978, and hold that, absent exigent circumstances, police who have probable cause to arrest a felony suspect must obtain a warrant before entering a dwelling to carry out the arrest.[1]

Prescott asks us to hold that there were no exigent circumstances to justify entry without a warrant. She points out that her apartment was located less than five blocks from San Francisco's Federal Court House, which was well stocked with federal judges and magistrates in the early hours of the afternoon when the arrest was carried out. She also argues that had the officers delayed to get a warrant, Duvernay could not possibly have escaped, armed resistance was unlikely given the non-violent nature of the offense, and the evidence which the officers sought was not readily susceptible of destruction. However, the trial judge never reached this question, and we do not know what showing the government might be able to make in response to Prescott's contentions. We therefore think that the better course is to remand for further proceedings.

## IV. REFUSAL OF ADMISSION

Because there may be a new trial, and in the interests of judicial economy, we consider Prescott's claim that her refusal to let the police enter her apartment without a warrant was constitutionally protected conduct which should not have been considered as evidence of the offense charged, i. e., of harboring or concealing Duvernay.

■ Defense counsel sought repeatedly to argue to the jury that Prescott was not obliged to consent to the search of her apartment and that her refusal to do so should not be considered as evidence against her. The court refused to permit this line of argument and refused to give a proposed jury instruction which stated, in part, "[i]t cannot be a crime, nor can it be evidence of a crime, for a citizen to refuse entry to his or her home to a law enforcement officer who does not have an appropriate warrant." The proposed instruction stated the law correctly, at least in this case, where there was no forcible resistance. It was prejudicial error to permit the government to prove, as evidence of the offense charged, that Prescott declined to unlock her door when the officers did not have a warrant.

■ "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search." *Bumper v. North Carolina*, 1968, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797. When, on the other hand, the officer demands entry but presents no warrant, there is a presumption that the officer has no right to enter, because it is only in certain carefully defined circumstances that lack of a warrant is excused. *Camara v. Municipal Court*, 1967, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 18 L.Ed.2d 930. An occupant can act on that presumption and refuse admission. He need not try to ascertain whether, in a particular case, the absence of a warrant is

---

1. See also, Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure, Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, February 1978, Rule 41 at pp. 70–72, and Advisory Committee Note at pp. 73–76.

excused. He is not required to surrender his Fourth Amendment protection on the say so of the officer. The Amendment gives him a constitutional right to refuse to consent to entry and search. His asserting it cannot be a crime, *Camara, supra,* 387 U.S. at 532–33, 87 S.Ct. 1727. Nor can it be evidence of a crime. *District of Columbia v. Little,* 1950, 339 U.S. 1, 7, 70 S.Ct. 468, 471, 94 L.Ed. 599:

> Had the respondent not objected to the officer's entry of her house without a search warrant, she might thereby have waived her constitutional objections. The right to privacy in the home holds too high a place in our system of laws to justify a statutory interpretation that would impose a criminal punishment on one who does nothing more than respondent did here.

(footnote omitted)

*See also, Schneckloth v. Bustamonte,* 1973, 412 U.S. 218, 233–34, 93 S.Ct. 2041, 36 L.Ed.2d 854; *Miller v. United States,* 5 Cir., 1956, 230 F.2d 486, 489–90.

■ One cannot be penalized for passively asserting this right, regardless of one's motivation. Just as a criminal suspect may validly invoke his Fifth Amendment privilege in an effort to shield himself from criminal liability, *Cole v. United States,* 9 Cir., 1964, 329 F.2d 437, 442; *United States v. Courtney,* 2 Cir., 1956, 236 F.2d 921, 923, so one may withhold consent to a warrantless search, even though one's purpose be to conceal evidence of wrongdoing.[2]

Had Prescott forcibly resisted the entry into her apartment, we might have a different case. We express no opinion on that question. We only hold that her passive refusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of criminal wrongdoing. If the government could use such a refusal against the citizen, an unfair and impermissible burden would be placed upon the assertion of a constitutional right and future

consents would not be "freely and voluntarily given." *Bumper v. North Carolina, supra,* 391 U.S. at 548, 88 S.Ct. 1788. And *see Simmons v. United States,* 1968, 390 U.S. 377, 389–94, 88 S.Ct. 967, 19 L.Ed.2d 1247.

■ The rule that we announce does not have as its raison d'etre the deterrence of unlawful conduct by law enforcement officers, as does the rule excluding evidence discovered and seized in the course of an unlawful search. Rather, it seeks to protect the exercise of a constitutional right, here the right not to consent to a warrantless entry.

The Supreme Court has held that the assertion by a defendant of his constitutional privilege against self incrimination under the Fifth Amendment cannot be used against him. In holding unconstitutional a provision of California's constitution permitting a prosecutor to comment on a defendant's failure to testify, *Griffin v. California,* 1965, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, the Court quoted from *Wilson v. United States,* 1893, 149 U.S. 60, at 66, 13 S.Ct. 765, at 766, 37 L.Ed. 650:

> ". . . the act was framed with a due regard also to those who might prefer to rely upon the presumption of innocence which the law gives to every one, and not wish to be witnesses. It is not every one who can safely venture on the witness stand, though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others and attempting to explain transactions of a suspicious character, and offences charged against him, will often confuse and embarrass him to such a degree as to increase rather than remove prejudices against him. It is not every one, however honest, who would therefore, willingly be placed on the witness stand. The statute, in tenderness to the weakness of those who from the causes mentioned might refuse to ask to be a witness, particularly when they may have been in some degree

2. Prescott testified that the reason she did not let the police in was to prevent them from arresting Johnson, for whom an arrest warrant on a heroin charge had been issued. It had nothing to do with not having a search warrant. In spite of this motivation, she still had a right to ask for a warrant and to refuse entry when none was produced.

compromised by their association with others, declares that failure of the defendant in a criminal action to request to be a witness shall not create any presumption against him."

149 U.S., p. 66, 13 S.Ct., p. 766.

If the words "Fifth Amendment" are substituted for "act" and for "statute," the spirit of the Self-Incrimination Clause is reflected. For comment on the refusal to testify is a remnant of the "inquisitorial system of criminal justice," *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678, which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly. 380 U.S. at 613–14, 85 S.Ct. at 1232 (footnote omitted)

This reasoning is equally applicable to using against the defendant her refusal to consent to entry into her home without a warrant. The right to refuse protects both the innocent and the guilty, and to use its exercise against the defendant would be, as the Court said in *Griffin*, a penalty imposed by courts for exercising a constitutional right.

Because the right to refuse entry when the officer does not have a warrant is equally available to the innocent and the guilty, just as is the right to remain silent, the refusal is as "ambiguous" as the silence was held to be in *United States v. Hale*, 1975, 422 U.S. 171, 176–77, 95 S.Ct. 2133, 45 L.Ed.2d 99. Yet use by the prosecutor of the refusal of entry, like use of the silence by the prosecutor, can have but one objective—to induce the jury to infer guilt. In the case of the silence, the prosecutor can argue that if the defendant had nothing to hide, he would not keep silent. In the case of the refusal of entry, the prosecutor can argue that, if the defendant were not trying to hide something or someone (in this

case Duvernay), she would have let the officer in. In either case, whether the argument is made or not, the desired inference may be well drawn by the jury. This is why the evidence is inadmissible in the case of silence. *United States v. Hale, supra,* 422 U.S. at 180, 95 S.Ct. 2133; *Doyle v. Ohio*, 1976, 426 U.S. 610, 617 fn.8, 96 S.Ct. 2240, 49 L.Ed.2d 91; *Grunewald v. United States*, 1957, 353 U.S. 391, 421–24, 77 S.Ct. 963, 1 L.Ed.2d 931. It is also why the evidence is inadmissible in the case of refusal to let the officer search.

 Inadmissible evidence, which can readily be misinterpreted by the jury, should not be admitted just to put the relevant facts in their true setting. For the reasons stated in *Hale, Doyle,* and *Grunewald, supra,* the facts in issue are so ambiguous as to be irrelevant. Moreover, they are so readily subject to misinterpretation by a jury as to render a curative or protective instruction of dubious value. See *Bruton v. United States*, 391 U.S. 123, 129–31, 132 n.8, 88 S.Ct. 1620, 20 L.Ed.2d 476; *Lakeside v. Oregon*, 1978, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319, dissenting opinion of Stevens, J., at 342, 98 S.Ct. 1091.

 A suggestion that the defendant may wish to have her refusal to admit the officers brought before the jury is beside the point. She can waive her right to refuse entry by a voluntary consent (*Schneckloth v. Bustamonte, supra*) just as a suspect can voluntarily waive his right to silence (*Miranda v. Arizona*, 1966, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694). She can also waive by not objecting to evidence of her refusal, or by testifying to it herself, just as a defendant can waive his Fifth Amendment privilege by not objecting to testimony as to his refusal to answer questions, or by taking the stand at his trial.[3] But so long as there is no waiver on her part, her refusal cannot be used against her.

---

**3.** It is well recognized that as an alternative to excluding evidence on the ground that it is confusing or prejudicial, the evidence can be admitted with an appropriate limiting instruction. See Advisory Note to Rule 403 of the Federal Rules of Evidence. Once it is established that the evidence of refusal is so prejudicial that it can be excluded and yet the right to exclude it is waived, it necessarily follows that defendant could seek to introduce it and ask for a limiting instruction.

Preventing the jury from hearing about the refusal at all is a commonly used device to avoid error. See Rule 103(c), F.R.Evid.:

(c) Hearing of jury. In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury.

Its use here is just as appropriate as in cases involving the Fifth Amendment privilege.

It is true, as the dissent demonstrates at elaborate length, that some costs do attach to the exercise of constitutional rights, including the Fifth Amendment privilege against self-incrimination and the Fourth Amendment right not to be subjected to unreasonable searches and seizures. It does not follow that such a cost should be imposed in a case in which it can be so readily avoided as in this one. The dissent asserts that a rule excluding evidence of refusal to admit the officers in a case like this one is "mischievous." Yet, it does not tell us how or why. The dissent does not deny that the refusal is ambiguous. It merely asserts that the evidence should be admitted so that the jury can, despite the ambiguity, draw an inference from it unfavorable to the defendant. This is exactly why the admission of this ambiguous evidence, rather than its exclusion, is "mischievous."

█ Should the case proceed to retrial, the district court should take care to exclude all evidence that Prescott refused to consent to the search and, if the evidence comes in inadvertently, should instruct the jury that Prescott's refusal was privileged conduct which cannot be considered as evidence of the crime charged. The government should be restricted to proving that the officers came to Prescott's apartment in search of Duvernay; that Prescott denied that he was there; and that they entered the apartment and found him there, thus showing her denials to be false. They should not be permitted to show that they broke down the door, as this would lead to the conclusion that Prescott had refused permission to enter.

## V. TELLING LIES

█ Finally, Prescott argues that we should not only reverse, but order dismissal of the charge, because her lying about Duvernay's presence in her apartment is not a violation of 18 U.S.C. § 3. She relies on *Miller v. United States, supra,* and on *United States v. Foy,* 7 Cir., 1969, 416 F.2d 940, and *United States v. Magness,* 9 Cir., 1972, 456 F.2d 976. Those cases do stand for the proposition that such a lie is not itself a violation of § 3. It does not follow, however, that the charge must be dismissed. Prescott did more. She received Duvernay in her apartment, together with the fruits of his crimes, and kept him there while he was opening the parcels and removing and attempting to dispose of the labels. Her lying would be evidence as to her intent in doing what she did.

Reversed and remanded for further proceedings.

---

SNEED, Circuit Judge (concurring in part and dissenting in part):

I concur in the court's opinion with the exception of Part IV from which I respectfully dissent.

Part IV enunciates a novel rule of constitutional proportions drawn primarily from precedents applicable to the Fifth Amendment privilege against self-incrimination and here made an appendage to the Fourth Amendment immunity from unreasonable search and seizure. The functionally significant question posed by the majority's novel rule is, "Must evidence of the exercise of the Fourth Amendment right to resist a search without a warrant be excluded at the option of a defendant charged with assisting a federal offender in order to hinder or prevent his apprehension, in violation of 18 U.S.C. § 3, when the search was based on exigent circumstances and not in violation of the defendant's Fourth Amendment rights." The majority answer yes as a matter of constitutional law. I respectfully dissent because I think the answer should be no.

## I.

### The Exercise Of Constitutional Rights Need Not Be Without Costs.

The majority has not framed the issue as precisely as I have. To them admission of the evidence of a refusal to admit the police would be the equivalent of a prosecutor commenting on the defendant's failure to testify or his post-arrest silence proscribed by *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) and *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The principle on which they rely was stated in its most sweeping form by Mr. Justice Black in his concurring opinion in *United States v. Grunewald*, 353 U.S. 391, 425, 77 S.Ct. 963, 984, 1 L.Ed.2d 931 (1957). There he said:

> "I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. *The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them.*"

(Italics added).

The due process rights under the Fifth and Fourteenth Amendments of the Constitution require that the exercise of constitutional rights must be free of penalties imposed by courts say Mr. Justice Black and the majority.[1] The difficulty with this is that no such broad principle exists.

If it were to exist, its most probable manifestation would be in connection with the Fifth Amendment privilege. Reducing the cost of exercising the privilege is compatible with its purpose, *viz.* the proscription of testimonial compulsion. *Schmerber v. California*, 384 U.S. 757, 764–65, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Any burden whatsoever on the exercise can be viewed as contributing to compulsion. Therefore, it is not surprising that we have decisions such as *Griffin, Grunewald, Doyle,* and *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). There are, on the other hand, decisions which recognize that not every contribution to testimonial compulsion is barred by the Constitution. Repeated questions on cross-examination reasonably related to the direct examination that could provoke the exercise of the privilege are a hazard which a defendant must confront in deciding whether he will take the stand on his own behalf. *United States v. Hearst,* 563 F.2d 1331, 1341 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). *Cf. Communist Party of United States v. Subversive Activities Control Board,* 367 U.S. 1, 108, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1960). That the hazard exists may induce him to refrain from testifying, in which case the purpose of the Fifth Amendment privilege is served while the right to testify is impaired. It might, however, induce the defendant to testify in a manner that eliminates any necessity to claim the privilege, in which case the hazard has contributed to the compulsion of testimony. Or, finally, the hazard may be accepted, as in *Hearst,* and the privilege claimed as needed on cross-examination. All recognize that under such circumstances the exercise of the privilege is not free of cost.

Nor is claiming the privilege by refraining from taking the stand without its costs as every defense attorney knows. *Cf. United States v. Grayson,* ―― U.S. ――, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) Mr. Justice Stewart dissenting, p. ―― n.5, 98 S.Ct. 2610. Such costs could be reduced by permitting the defendant to determine whether the jury should be given a cautionary instruction designed to preclude an adverse inference from being drawn by his failure to testify. The Supreme Court recently has

---

1. The majority to acknowledge in revisions in response to this dissent that "some costs do attach to the exercise of constitutional rights . . . ". *See* p. 1353. However, it is reasonably clear that the majority continue to view their result as required by constitutional law. It is this belief that the constitution requires their result which I believe to be erroneous and, as I say at slip op. p. 1353, "mischievous." This latter quality exists because the extent to which an accused can use the principle to distort selectively the facts surrounding an entry to search cannot be reasonably predicted within the limits we normally require in promulgating sound principles of law.

refused to so reduce the costs. *See Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978). An even further reduction of the costs of claiming the privilege could be achieved by requiring that the jury be charged that a claim of privilege is evidence of innocence. Diligent search reveals no instance in which this has been considered; yet not to so charge increases the chances that juries will draw adverse inferences from the failure to testify.

Not only are costs, albeit thought to be tolerable in amount, attached to the proper exercise of the Fifth Amendment privilege, but very substantial costs can be assessed for improper efforts to exercise the privilege. Imprisonment for contempt, for example, can be the result of an unjustified refusal on alleged Fifth Amendment grounds to testify before a grand jury. *Cf. Brown v. United States*, 359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959), *overruled on other grounds, Harris v. United States*, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965), and *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *Matter of Fischel*, 557 F.2d 209 (9th Cir. 1977). Moreover, a good faith belief in the soundness of the assertion of the privilege does not provide immunity from contempt. *Cf. Matter of Fred R. Witte Center Glass No. 3*, 544 F.2d 1026 (9th Cir. 1976).

The Supreme Court also recently has held that costs can be attached to the exercise of "a defendant's statutory right, 28 U.S.C. § 3481, and perhaps a constitutional right to testify on his own behalf." *United States v. Grayson*, —— U.S. ——, p. ——, 98 S.Ct. 2610, p. 2618, 57 L.Ed.2d 582 (1978). To permit a sentencing judge to consider in fixing the defendant's sentence the probable untruthfulness of the defendant's testimony was held not to impair impermissibly the defendant's right to testify. The burden of the risk was not considered intolerable.

Another tolerable risk attending the exercise of a constitutional right recently was recognized in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). It was held that it was not improper for a prosecutor, in negotiating with the defendant to plead guilty, to threaten to reindict the defendant on a more serious charge, which the prosecutor had probable cause to believe the defendant had committed, if the plea was not forthcoming, and to carry out that threat when the defendant rejected the plea bargain.

II.

*The Principle of Appreciable Impairment.*

A definitive treatment of the entire issue of the "costs" that properly may be visited on those exercising constitutional rights in the criminal justice process appears in *Chaffin v. Stynchcombe*, 412 U.S. 17, 30–31, 93 S.Ct. 1977, 1984, 36 L.Ed.2d 714 (1973). Mr. Justice Powell's majority opinion stated:

"*Jackson* [*United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)] did not hold, as subsequent decisions have made clear, that the Constitution forbids every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights. In *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), *Parker v. North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970), and *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), defendants entered pleas of guilty in order to avoid the potential imposition of death sentences by a jury. Each was dissuaded from exercising his rights to a jury trial and to plead not guilty. Each was, in that sense, 'discouraged' from asserting his rights, but the Court found no constitutional infirmity despite the claim in each case that *Jackson* compelled a contrary result. *Brady* is particularly instructive. The Court there canvassed several common plea-bargaining circumstances in which the accused is confronted with the 'certainty or probability' that, if he determines to exercise his right to plead innocent and to demand a jury trial, he will receive a higher sentence than would

have followed a waiver of those rights. 397 U.S. at 751, 90 S.Ct. 1463. Although every such circumstance has a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices was upheld as an inevitable attribute of any legitimate system which tolerates and encourages the negotiation of pleas." (Footnote omitted).

Mr. Justice Powell, invoking Mr. Justice Harlan's opinion in *Crampton v. Ohio*, a companion case to *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), put the nub of the matter this way:

"Recognizing that the inquiry, by its very nature, must be made on a case-by-case basis, the Court [in *Crampton*] indicated that the 'threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved'." 412 U.S. at 32, 93 S.Ct. at 1985.

### III.

*No Appreciable Impairment of Fourth Amendment Policies.*

Placed within the framework of the analysis of Justices Harlan and Powell, the question is whether visiting upon the defendant in this case the admission of her assertion of her Fourth Amendment rights has subjected her to an election between forsaking and asserting her rights that "impairs to an appreciable extent any of the policies" behind Fourth Amendment rights.

The Amendment's purpose "is to safeguard the privacy and security of individuals against arbitrary invasion of government officials." *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). No impairment to an appreciable extent would result from the admission of defendant's assertion in this case. That this is so quickly becomes clear when it is remembered that should exigent circumstances not exist to justify the warrantless search all basis for prosecution of the defendant disappears. The presence of Duvernay and his parcels in her apartment vanishes leaving nothing of the government's case. That is, whether the assertion itself is admissible or not, the familiar exclusionary rule is available to afford protection to the defendant against "arbitrary invasions of government officials." The defendant only needs the majority's rule when it is established that the rights she asserts do not exist. To no extent, at least in theory, are the defendant's Fourth Amendment rights impaired by the admission in evidence of the fact that they have been asserted.

The majority's concern perhaps is with the remote possibility that one answering the knock of police demanding entrance to search, aware that his refusal on Fourth Amendment grounds might come out in a trial some time later, will timidly admit the officers without protest. Although it remains unclear how such admission would impair any Fourth Amendment rights, perhaps the majority believes that timidity may be construed as consent to the search and that, in any event, a firm insistence on Fourth Amendment rights furthers the Amendment's purposes.

I am unpersuaded. Even a lawyer, much less one who is not a lawyer, is unlikely to permit the possibility that his assertion by Fourth Amendment rights might be admitted in evidence in a later prosecution to influence his response to a policeman's knock and demand to enter and search. More immediate concerns will govern his response. Nor is it likely that a mere timid failure to assert Fourth Amendment rights will be interpreted as consent to search. *See, Amos v. United States*, 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654 (1921); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. Page*, 302 F.2d 81, 84 (9th Cir. 1962), *en banc* (Opinion by Duniway, J.). And finally, inadmissibility of the assertion of Fourth Amendment rights is not likely to embolden those less inclined to assert those rights. Aside from the fact that the cases which come before this court reflect no timidity in asserting Fourth Amendment rights, the causal link between inadmissibility and the vigor with which Fourth Amendment rights

are asserted is too attenuated to justify the conclusion that admissibility will impair to an appreciable extent any of the policies of the Fourth Amendment.

The majority recognizes, as it must, that its rule is unrelated to the deterrent purpose served by the exclusionary rule devised by the courts to further the policies of the Fourth Amendment. The conduct of law enforcement officers will be uninfluenced in theory, as well as in fact, by the majority's rule which, I repeat, generally will be needed by the accused only when none of his Fourth Amendment rights have been violated. Warrantless searches based on proper exigent circumstances are not a second class of searches under the Fourth Amendment that should be judicially discouraged. They are necessary to law enforcement, are in the public interest, and not violative of the Fourth Amendment.

## IV.

### No Appreciable Impairment Of Fifth Amendment Policies.

The true problem which this case presents is that, although admission of the defendant's assertion of Fourth Amendment rights does not impair to an appreciable extent the policies of the Fourth Amendment, the assertion tends to inculpate the defendant of the crime of which she is charged. This troubles the majority. It should not do so. In principle the issue is no different from that presented by an effort to exclude from evidence, in a prosecution for possession by a felon of a firearm, under 18 U.S.C.A.App. § 1202, a good faith, but erroneous, assertion by the felon to an undercover agent that notwithstanding the law the Second Amendment entitled him "to keep and bear arms." The assertion is inculpatory, and I should think admissible, notwithstanding its reference to a supposed constitutional right. I suspect that the majority would agree had the officers in this case equipped themselves with a proper warrant and had the defendant asserted that the warrant was invalid. But, to repeat, a warrantless search based on proper exigent circumstances no more con-

travenes the Fourth Amendment than does a search based on a proper warrant.

The inculpatory nature of the assertion calls into play no Fifth Amendment considerations. The assertion bears no mark of testimonial compulsion; the defendant was not in custody when she made it. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is true that but for the officers coming to the defendant's door there would have been no assertion of Fourth Amendment rights; but this does not make her confrontation with the officers a "custodial police interrogation." *United States v. Irion,* 482 F.2d 1240, 1244–45 (9th Cir. 1973). Admission of the assertion will not impair to an appreciable extent any of the policies of the Fifth Amendment.

Nothing I have said is contrary to the holdings of *District of Columbia v. Little,* 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950), and *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The defendant's assertion of Fourth Amendment rights, even if without foundation, cannot constitute the crime with which the defendant is charged. The jury on retrial should be so instructed. *Little* and *Camara* do not support the proposition that an assertion of Fourth Amendment rights is inadmissible in a prosecution such as before us. To extend the reach of these cases to that point is to confuse inculpatory evidence of a crime with the elements of a crime. Perhaps the majority believes that only by excluding evidence of the assertion can the jury be prevented from convicting solely on the ground of the assertion contrary to the holding of *Little* and *Camara.* If so, it has exalted a situation more properly governed by Rule 403, Fed.R.Evid., into a mischievous principle of constitutional law.

## V.

### What Our Holding With Respect To Part IV Ought To Be.

The conclusion is inescapable that admission of defendant's assertion of her Fourth Amendment rights in this case would not

impair to an appreciable extent any of the policies of either the Fourth or Fifth Amendments. Therefore, I would hold that evidence of the exercise by the defendant of her Fourth Amendment right to resist a search without a warrant can be admitted in evidence, at the option of either the prosecution or defense, in any retrial of the defendant on charges of having violated 18 U.S.C. § 3. If admitted, the jury should be given the cautionary instruction required by *Little* and *Camara*. This would not be an unjust result because under the circumstances of this case a retrial will occur, to repeat, only if the warrantless search was proper; if improper, the suppression of the fruits of the search will make a trial and conviction extremely unlikely.