OPINION
 

 By the Court, Rose, J.:
 

 Willie Sampson was sentenced to multiple life sentences after a jury convicted him of one count of first-degree kidnapping, two counts of lewdness with a minor under the age of fourteen, one count of attempted sexual assault on a minor under the age of fourteen, and one count of sexual assault on a minor under the age of fourteen. Sampson pleaded guilty to one count of possession of a firearm by an ex-felon. Sampson appeals his conviction, arguing that the district court erred by (1) refusing to allow him to introduce a new expert witness eight days into trial to testify regarding a mental disorder with which the victim was allegedly diagnosed, (2) permitting the prosecution to elicit testimony discussing Sampson’s refusal to allow officers to search his home pursuant to his Fourth Amendment right to refuse to consent to a warrantless search, and (3) denying Sampson’s motion for a mistrial based on police testimony that Sampson had invoked his Fifth Amendment right to remain silent and to be provided with counsel.
 

 We first conclude that the district court did not abuse its discretion when it denied Sampson’s request to introduce a late-disclosed expert witness to discuss the victim’s alleged mental disorder. Second, we join other courts in adopting the rule that a district court errs when it allows evidence or testimony during trial regarding a defendant’s invocation of Fourth Amendment rights. However, this error is subject to a harmless error analysis, and where the evidence or testimony is merely a passing reference, the error is harmless and does not require reversal of a conviction. We conclude that the reference to Sampson’s exercise of his Fourth Amendment rights was a mere passing reference and, thus, harmless error. Finally, we conclude that the district court did not err by denying Sampson’s motion for a mistrial based on the testimony concerning his Fifth Amendment rights. We therefore affirm Sampson’s conviction.
 

 FACTS
 

 The events giving rise to Sampson’s conviction stem from an encounter where Sampson picked up the victim, a minor boy, and drove him first to McDonald’s and then to Sampson’s residence. Sampson’s conviction was based primarily on the testimony of the minor boy, which drastically conflicted with Sampson’s own testimony. At trial, the victim presented the following testimony.
 

 
 *824
 
 The victim said that he first saw Sampson when Sampson drove past him as he walked down the street. When he stopped to rest at a bus stop, Sampson turned his vehicle around and stopped next to the victim, asking the victim where the closest McDonald’s was located. Sampson asked the victim if he wanted anything to eat from McDonald’s. The victim replied that he did, and Sampson asked the victim to get into his car. Sampson took him to McDonald’s, where he purchased food for the victim, and then took the victim to Sampson’s residence to eat.
 

 After the victim finished eating, Sampson told the victim that he would be right back because he needed to get his cell phone from his vehicle. Instead, Sampson returned with a gun, which he pointed at the victim and told the victim to do what he . said. Sampson took the victim into the bathroom and told him to remove his clothing. Sampson put a white scarf around the victim’s head to cover his eyes and ordered him to get into the bathtub and “wash up good.” Sampson then got into the tub and sat face-to-face with the victim. Sampson washed the victim and touched the victim’s penis and buttocks during the washing.
 

 Afterwards, Sampson dried the victim off, took him to a back room, told him to lie down, and rubbed lotion on the victim. The victim was lying on his back, and Sampson slid underneath him, also lying on his back. Sampson put the victim’s hand on his penis and asked the victim to masturbate him. The victim refused, and Sampson took the victim’s hand, placed it on Sampson’s penis, and forced the victim to masturbate him until he ejaculated.
 

 Sampson also placed his penis near the victim’s face, touching the victim’s nose and repeatedly instructing him to suck his penis. The victim refused. Afterward, the victim asked Sampson if he could watch television and also asked for his clothing back. Sampson did not return his clothing but, instead, gave the victim a pair of silver boxer shorts and a tee shirt to wear.
 

 Sampson allowed the victim to watch television in his living room. The victim asked Sampson for some chips, and Sampson then made a list of items that the victim wanted from the grocery store. Sampson tied the victim up in a chair and left to go to the store. After Sampson left for the store, the victim freed himself from the ropes and returned to his own apartment.
 

 Cross-examination of the victim and the additional testimony of other witnesses revealed several inconsistencies in the victim’s testimony. During the preliminary hearing, the victim was asked if Sampson ever put his hand on the victim’s private parts, to which the victim replied “no.” There were also inconsistencies between the victim’s trial testimony and the recorded statement he gave police following the incident. The inconsistencies concerned the color of the soap that Sampson washed the victim with, whether both
 
 *825
 
 Sampson and the victim ate their McDonald’s meals, whether Sampson tied the victim up more than once, and whether the sexual assault occurred while the victim was tied up. Finally, in his recorded statement, the victim told officers that Sampson rubbed lotion on his crotch and identified where that was on his body. However, at trial the victim testified that he believed his crotch was his rectum and said that Sampson never put lotion on his penis.
 

 There were also discrepancies between the victim’s testimony and his mother’s testimony. His mother testified that when he arrived at home he was hysterical and crying and he told her that a man kidnapped him and took him to the man’s home. He told her that Sampson grabbed him and threw him into the car. However, the victim never told officers that Sampson grabbed him or threw him into his car. The victim also never told his mother about the trip to McDonald’s, but he did tell her that he ate McDonald’s food when he arrived at Sampson’s house.
 

 After the victim told his mother about the incident, his mother asked him to take her to Sampson’s house. After he showed her where Sampson lived, his mother called the police from Sampson’s neighbor’s house. While the police interviewed the victim, Sampson pulled into the driveway of his residence.
 

 Sampson allowed the police to search his vehicle, and the police found two grocery bags, which contained candy, cookies, and chips. Officers then asked Sampson for permission to search his residence, to recover the victim’s clothing, and Sampson refused consent. Once a search warrant was obtained, officers searched Sampson’s residence. They found garbage from McDonald’s, a chair with yellow ropes on it, a bottle of lotion, a black revolver, boy’s boxer shorts, green sweatpants, and a grocery-shopping list. Sampson was taken into custody and he requested an attorney.
 

 Sampson’s testimony differed greatly from the victim’s testimony. He stated he noticed the victim at a bus stop and the victim waved for Sampson to stop. Sampson pulled over, stopped, and rolled down the car window. The victim apologized for stopping Sampson and told him that he thought Sampson was his best friend’s father because the car Sampson drove looked similar.
 

 Sampson testified that the minor boy asked him for a ride to McDonald’s. Sampson purchased the McDonald’s food and gave the victim two dollars of the change. Sampson said that he needed to go home to do some work, and the victim asked if he could come with him.
 

 Sampson stated he did not push the boy and did not force him into the house. They both sat at the kitchen table and ate their meals. Sampson asked the victim to call home but the victim refused to call home and, instead, watched television while Sampson cleaned the kitchen.
 

 
 *826
 
 Sampson testified that the victim smelled dirty and his clothes were filthy so he offered to wash the victim’s clothes at his neighbor’s house and told the victim that he should take a bath. Sampson testified that he did not bathe at his house, and he did not get into the tub with the victim.
 

 According to Sampson, the victim put on clothes that Sampson offered to him to wear until he washed the victim’s clothes. Sampson did not remain in the room while the victim changed clothes. When the victim was changing, the victim noticed a chair with ropes on it that Sampson used during sexual activities with a female acquaintance. The victim played with the ropes until Sampson told him to stop and to get away from the chair.
 

 Sampson testified that he cooked chicken for the two to eat and then decided to go to the store. Sampson denied ever attempting to have sex with the boy or touching him in any way.
 

 David Welch, a forensic chemist with the Las Vegas Metropolitan Police Department (LVMPD), testified as an expert for the State. He said that DNA testing on penile swabs from Sampson and the victim revealed no foreign DNA. The medical examination of the victim revealed no bodily fluids, bite marks, bruising, or evidence of sexual assault. Semen was found in a handkerchief inside Sampson’s home, but towels found in the bathroom and Sampson’s bedclothes were tested and failed to reveal the presence of any semen. These items were not tested to reveal the presence of foreign DNA. There was no physical evidence to corroborate the victim’s allegation of oral sex.
 

 On the eighth day of trial, Sampson attempted to introduce the victim’s school records, which indicated that the victim had been diagnosed with Oppositional Defiant Disorder (ODD). Sampson also attempted to introduce Dr. Racoma as an expert witness, who had made the ODD diagnosis. ODD is an illness that is characterized by lying. Sampson’s defense theory was that the victim lied about the alleged abduction and molestation, which accounted for the discrepancies in the victim’s stories. The district court denied Sampson’s requests.
 

 Additionally, during trial, two officers were questioned regarding whether they spoke with Sampson at the crime scene, and if so, what Sampson said. Both officers responded that they asked Sampson’s permission to search his residence without a search warrant, which he refused. Sampson’s counsel made no objection to this testimony. Another officer was also questioned regarding whether he made contact with Sampson at the crime scene. This officer responded that he did not because by the time the officer arrived at the crime scene, Sampson was already in a patrol car and had requested an attorney. Sampson’s counsel moved for a mistrial, but the district court denied the request.
 

 
 *827
 
 The jury convicted Sampson of one count of first-degree kidnapping, two counts of lewdness with a minor, one count of attempted sexual assault on a minor under the age of fourteen, and one count of sexual assault on a minor under the age of fourteen. Sampson was sentenced to multiple life terms. Sampson appealed, arguing that his conviction should be reversed because the district court did not allow him to introduce Dr. Racoma and because the State’s witnesses commented on Sampson’s invocation of his Fourth and Fifth Amendment rights.
 

 DISCUSSION
 

 Exclusion of expert testimony
 

 Sampson argues that the district court erred by refusing to allow him to call Dr. Racoma to testify regarding the fact that the victim was diagnosed with ODD. The district court has discretion to determine the admissibility of expert testimony, and we review this decision for a clear abuse of discretion.
 
 [1]
 

 Under NRS 174.234(l)(a), both defense counsel and the prosecution must submit to each other, at least five days prior to trial, written notice of all witnesses they intend to call. Further, under NRS 174.234(2), written notice of expert witnesses must be filed and served upon the opposition at least twenty-one days before trial. Pursuant to NRS 174.295(2), the remedy for a violation of the discovery provisions of NRS 174.234 is that the district court “may order the party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances.’ ’
 

 When addressing discovery violations, the district court must be cognizant that defendants have the constitutional right to discredit their accuser, and this right “can be but limitedly circumscribed.”
 
 [2]
 
 Therefore, to protect this constitutional right, there is a strong presumption to allow the testimony of even late-disclosed witnesses, and evidence should be admitted when it goes to the heart of the case.
 
 [3]
 
 However, the district court must also balance this right against ‘ ‘not only the waste of judicial time factor . . . but must
 
 *828
 
 take particular care not to permit annoying, harassing, humiliating and purely prejudicial attacks unrelated to credibility.”
 
 [4]
 

 We agree with Sampson that the testimony he sought to admit would have been helpful to his defense. However, the district court did not abuse its discretion when it denied Sampson the right to call Dr. Racoma. Sampson had access to the victim’s school records prior to trial, but Sampson’s counsel states that because the writing in the school records was unclear, he believed that the doctor’s name was “Dr. Raconia” instead of “Dr. Racoma.” Thus, he argues that there was no delay in disclosing Dr. Racoma as an expert witness because he did not find out that the report was actually referring to Dr. Racoma until the eighth day of trial.
 

 We find this assertion unpersuasive. Although Dr. Racoma’s name was spelled incorrectly, it nonetheless would not have been difficult for Sampson’s counsel to locate Dr. Racoma based on these records. Also, even if Sampson’s counsel could not locate Dr. Racoma, he could have brought in evidence of the victim’s diagnosis of ODD in other ways. Most clearly, Sampson’s counsel could have used the school records to question the victim’s mother regarding the ODD diagnosis.
 
 [5]
 

 Further, the State did not anticipate this witness and had Dr. Racoma’s testimony been allowed, it would have resulted in an unfair surprise to the State. Fairness during trial is not one-sided and applies to both the defendant and the State. The fault herein lies not with the district court, but instead with Sampson’s attorney, who inexplicably failed to present the evidence contained in the school records or timely pursue testimony from Dr. Racoma. Thus, the district court did not abuse its discretion by denying Sampson’s request to introduce Dr. Racoma.
 
 [6]
 

 Testimony relating to Sampson’s invocation of Fourth Amendment rights
 

 Sampson argues that the district court erred by permitting the State to present testimony that discussed Sampson’s invocation of
 
 *829
 
 his Fourth Amendment right to refuse to consent to a search of his residence. The testimony at issue was elicited by the State from two LVMPD officers who testified that they asked Sampson if they could enter his residence to retrieve the victim’s clothing, and Sampson replied that he did not want them to enter his home. Sampson did not object to this testimony and therefore has the burden of establishing that plain error affecting his substantial rights occurred.
 
 [7]
 
 We conclude that he fails to do so.
 

 Whether it is constitutional error for a prosecutor to elicit testimony or comment on a defendant’s refusal to consent to a war-rantless search to support an inference of guilt is an issue of first impression in Nevada. This proposition has been assumed by many courts,
 
 [8]
 
 and today we adopt this rule in Nevada. As one court has stated, “[A]n individual should be able to invoke his Fourth Amendment rights without having his refusal used against him at trial.’ ’
 
 [9]
 

 Courts addressing this issue recognize that there are similarities between exercising Fourth Amendment rights and exercising other constitutional rights, and they determine that it is improper for the State to effectively punish a defendant for asserting her constitutional rights.
 
 [10]
 
 One court has stated, “Just as a criminal suspect may validly invoke his Fifth Amendment privilege in an effort to shield himself from criminal liability, so one may withhold consent to a warrantless search, even though one’s purpose be to conceal evidence of wrongdoing.”
 
 [11]
 

 
 *830
 
 This court has previously addressed references made during trial to a defendant’s exercise of her Fifth Amendment rights, and in
 
 Morris
 
 v.
 
 State,
 

 [12]
 

 we set forth the test to determine whether such a comment results in reversible error. In
 
 Morris,
 
 we held that references to a defendant’s exercise of her Fifth Amendment rights are harmless beyond a reasonable doubt and do not require reversal of a conviction if, “(1) at trial there was only a mere passing reference, without more, to an accused’s post-arrest silence, or (2) there is overwhelming evidence of guilt.”
 
 [13]
 
 Today we adopt this test for comments on a defendant’s exercise of Fourth Amendment rights. Thus, where there is only a mere passing reference, without more, to an accused’s invocation of Fourth Amendment rights, there is harmless error.
 
 [14]
 

 Based on the test set forth in
 
 Morris,
 
 we conclude that in the instant case the district court erred in allowing this testimony. But even assuming that the error was plain, it did not prejudice Sampson’s substantial rights. The testimony of the police officers regarding Sampson’s refusal to consent to the warrantless search of his residence was no more than a mere passing reference. The officers were asked if they spoke with the defendant, and if so, what the defendant said to them. This was not questioning that was aimed at discussing Sampson’s refusal to consent to the warrantless search of his residence. Thus, although the district court erred by
 
 *831
 
 allowing this testimony, the error was not prejudicial and does not require reversal of Sampson’s conviction.
 

 Testimony relating to Sampson’s invocation of Fifth Amendment rights
 

 During trial, Sampson brought a motion for a mistrial based upon the testimony of Detective Castaneda discussing Sampson’s invocation of the right to remain silent and to have an attorney. Detective Castaneda testified that when he arrived at the scene of the crime, he was informed that Sampson had already been detained in a patrol car and that officers and detectives were not speaking with Sampson because he had requested an attorney. The State apologized for the testimony, argued that it had not elicited the testimony, and offered a curative instruction. Sampson refused the instruction. The district court admitted that the comments were error but determined the error to be harmless and denied Sampson’s motion for a mistrial. We agree with the district court that this testimony was error and that such error was harmless.
 

 Whether a prosecutor’s comment on a defendant’s invocation of her Fifth Amendment rights is reversible error depends on whether “‘“the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be comment on the defendant’s [assertion of her Fifth Amendment rights].” ”’
 
 [15]
 
 Also, comments concerning the invocation of a defendant’s Fifth Amendment rights are only unconstitutional when they are designed to draw a meaning from the silence.
 
 [16]
 
 When determining the intended meaning, we view these improper prosecutorial comments in context, and a criminal conviction should not be lightly overturned on the basis of the comments alone.
 
 [17]
 
 The same is true for brief testimonial comments. As discussed, the test for whether a conviction must be overturned is whether there was more than a mere passing reference to the invocation of Fifth Amendment rights.
 
 [18]
 

 We conclude that Detective Castaneda’s statement was merely a passing reference. Detective Castaneda’s statement was unsolicited
 
 *832
 
 by the State, and he testified to the above in response to questions about what he found when he arrived at the scene of the crime and whether he made any contact with the suspect at that time. Thus, the context of his statement was not designed to draw a meaning from silence and amounted to harmless error.
 

 CONCLUSION
 

 For the above-stated reasons, the errors committed at trial warrant no relief. Accordingly, we affirm the judgment of conviction.
 

 Becker, C. J., and Parraguirre, J., concur.
 

 [1]
 

 Brown v. State,
 
 110 Nev. 846, 852, 877 P.2d 1071, 1075 (1994);
 
 Smith
 
 v.
 
 State,
 
 100 Nev. 570, 572, 688 P.2d 326, 327 (1984).
 

 [2]
 

 Reese
 
 v.
 
 State,
 
 458 A.2d 492, 496 (Md. Ct. Spec. App. 1983).
 

 [3]
 

 Farris v. State,
 
 818 N.E.2d 63, 69 (Ind. Ct. App. 2004);
 
 see U.S.
 
 v.
 
 Shay,
 
 57 F.3d 126, 134 (1st Cir. 1995).
 

 [4]
 

 Reese,
 
 458 A.2d at 497.
 

 [5]
 

 Sampson’s counsel questioned the victim’s mother regarding the medication that he took for Attention Deficit Hyperactivity Disorder. The victim’s mother denied that the victim had been diagnosed with any other disorders. Although Sampson’s counsel then had the opportunity to show the victim’s mother the school records reflecting the diagnosis of ODD while she was on the witness stand, he tailed to do so.
 

 [6]
 

 Sampson also argues that the district court erred by limiting the scope of his cross-examination of both the victim’s mother and Dr. Vergara in violation
 
 *829
 
 of his due process rights to confront the witnesses against him. We have considered this assertion and conclude that it is without merit.
 

 [7]
 

 See
 
 NRS 178.602.
 

 [8]
 

 The Fifth Circuit, when determining that it was constitutional error for a trial court to permit the prosecutor to comment or present testimony on a defendant’s refusal to consent to a warrantless search to support an inference of guilt, pointed out that all of the circuit courts that have addressed this issue have determined that a defendant’s refusal to consent to a warrantless search may not be used as evidence of guilt.
 
 U.S. v. Runyan,
 
 290 F.3d 223, 249 (5th Cir. 2002) (citing
 
 U.S. v. Moreno,
 
 233 F.3d 937, 940-41 (7th Cir. 2000);
 
 U.S. v. Dozal,
 
 173 F.3d 787, 794 (10th Cir. 1999);
 
 U.S. v. Thame,
 
 846 F.2d 200, 205-08 (3d Cir. 1988);
 
 United States v. Prescott,
 
 581 F.2d 1343, 1351-52 (9th Cir. 1978)). At least two other state courts agree with this analysis.
 
 See Padgett
 
 v.
 
 State,
 
 590 P.2d 432, 434 (Alaska 1979);
 
 Mackey v. State,
 
 507 S.E.2d 482, 484 (Ga. Ct. App. 1998).
 

 [9]
 

 Mackey,
 
 507 S.E.2d at 484.
 

 [10]
 

 Thame,
 
 846 F.2d at 206-07;
 
 Prescott,
 
 581 F.2d at 1351.
 

 [11]
 

 Prescott,
 
 581 F.2d at 1351 (citations omitted). In
 
 Prescott,
 
 the court instructed that
 

 [s]hould the case proceed to retrial, the district court should take care to exclude all evidence that Prescott refused to consent to the search and,
 
 *830
 
 if the evidence comes in inadvertently, should instruct the jury that Prescott’s refusal was privileged conduct which cannot be considered as evidence of the crime charged.
 

 Id.
 
 at 1353.
 

 [12]
 

 112 Nev. 260, 913 P.2d 1264 (1996).
 

 [13]
 

 Id.
 
 at 264, 913 P.2d at 1267-68 (citations omitted). In the instant case, there was not overwhelming evidence of guilt. Sampson’s conviction was based solely on whether the jury found the victim more credible than Sampson. Thus, our application of the harmless error analysis with regard to comments on the invocation of Fourth Amendment rights is limited only to what constitutes a mere passing reference. We do not address the second part of the
 
 Morris
 
 test concerning overwhelming evidence of guilt. We provide that prong of the
 
 Morris
 
 test in this discussion only for completeness in describing the test.
 

 [14]
 

 However, to be clear, where, for instance, a defendant claims that she cooperated folly with the police during the investigation, and the State then questions the defendant or other witnesses regarding the defendant’s compliance with the search, the defendant may not then argue that there has been reversible error based on the State’s comment on her invocation of Fourth Amendment rights. The rule we adopt today applies only to defendants who have not put their compliance with a search into issue.
 

 [15]
 

 Knight
 
 v.
 
 State,
 
 116 Nev. 140, 144, 993 P.2d 67, 71 (2000) (quoting
 
 Harkness
 
 v.
 
 State,
 
 107 Nev. 800, 803, 820 P.2d 759, 761 (1991) (quoting
 
 United States
 
 v.
 
 Lyon,
 
 397 F.2d 505, 509 (7th Cir. 1968))).
 

 [16]
 

 Washington v. State,
 
 112 Nev. 1054, 1060, 921 P.2d 1253, 1257 (1996).
 

 [17]
 

 Knight,
 
 116 Nev. at 144-45, 993 P.2d at 71.
 

 [18]
 

 Morris v. State,
 
 112 Nev. 260, 264, 913 P.2d 1264, 1267-68 (1996).