The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 3, 2022

## 2022COA14

**No. 17CA1079, *People v. Buckner* — Constitutional Law — Fourth Amendment — Searches and Seizures — Warrantless Search; Crimes — Unlawful Sexual Behavior — Victim's and Witness's Prior History**

A division of the court of appeals considers whether the district court plainly erred by allowing the prosecution to, first, comment regarding the defendant's exercise of his Fourth Amendment right to refuse to consent to a warrantless search and, second, ask the jury to render a guilty verdict to do justice for the victim. A majority of the division concludes that the comments were obviously improper, cumulatively undermined the fundamental fairness of the trial, and cast doubt on the reliability of the jury's verdict. Although the partial dissent disagrees that the

prosecutor's comments warrant reversal, the division reverses the defendant's convictions and remands for a new trial.

Because the issue is likely to arise on remand, the division also concludes that the district court erred by denying the defendant an evidentiary hearing on his motion to admit evidence that the victim had a history of false reporting of sexual assaults. The division concludes that the defendant's offer of proof was sufficient to warrant a hearing. In so doing, the division concludes, as a matter of first impression, that the plain statutory language "history of false reporting of sexual assaults" in Colorado's rape shield statute, section 18-3-407(2), C.R.S. 2021, does not require that the allegedly false report be made to law enforcement.

COLORADO COURT OF APPEALS                                    **2022COA14**

Court of Appeals No. 17CA1079
City and County of Denver District Court No. 15CR5224
Honorable Martin F. Egelhoff, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Larry D. Buckner,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE BROWN
Lipinsky, J., concurs
Furman, J., concurs in part and dissents in part

Announced February 3, 2022

Philip J. Weiser, Attorney General, Ellen Michaels, Assistant Attorney General,
Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Lynn Noesner, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 Defendant, Larry D. Buckner, appeals his judgment of conviction and sentence for kidnapping and sexual assault. He contends that the district court (1) plainly erred by allowing the prosecution to engage in reversible misconduct and (2) erred by failing to hold an evidentiary rape shield hearing. We agree with both contentions.[1]

¶ 2 First, we conclude that the district court plainly erred by allowing prosecutors to improperly comment on Buckner's exercise of his Fourth Amendment right to refuse to consent to a warrantless search and to improperly pressure the jury to render a guilty verdict to do justice for the victim. Considered cumulatively, these errors require us to reverse his convictions and remand for a new trial.

¶ 3 Because the issue is likely to arise on remand, we also conclude that the district court erred by denying Buckner an evidentiary hearing on his motion to admit evidence that the victim had a history of false reporting of sexual assaults. In so doing, and as a matter of first impression, we reject the People's argument that

---

[1] On appeal, Buckner also contends that the Sex Offender Lifetime Supervision Act of 1998 is unconstitutional. Because we reverse his convictions as set forth below, we need not address the constitutionality of his sentence.

section 18-3-407(2), C.R.S. 2021, requires that the allegedly false reports contemplated by the statute be made to law enforcement.

## I.     Background

¶ 4     On September 18, 2015, J.D. told police that she had been physically assaulted the previous night by an unknown assailant in an alley several blocks from her apartment.  That same day, a sexual assault nurse examiner (SANE) evaluated J.D. and documented bodily and genital trauma.

¶ 5     Four days later, J.D. had a follow-up interview with police about the September 17 attack.  This time she told police that one of her neighbors "pulled [her] into his apartment, threw [her] on the couch," and proceeded to beat and sexually assault her in his apartment for approximately eight hours starting late on the night of September 17 and into the early morning of September 18.  She admitted that she fabricated the alley attack story but said she did so because she was scared.  From a photo array, J.D. identified Buckner, one of her neighbors, as the perpetrator.

¶ 6     Police arrested Buckner and the People charged him with one count of second degree kidnapping, two counts of sexual assault,

one count of first degree assault, and one count of second degree assault.

¶ 7    Buckner went to trial on the charges in October 2016. His theory of the case was that J.D.'s physical injuries were caused by her girlfriend during a domestic dispute and that he and J.D. had a consensual encounter. The jury acquitted Buckner of the assault charges but hung on the kidnapping and sexual assault charges, so the court declared a mistrial.

¶ 8    Buckner was retried on the kidnapping and sexual assault charges in February 2017. The prosecution and defense theories remained the same.

¶ 9    On cross-examination, J.D. admitted that, after she put her daughter to bed on the night of September 17, she was "kind of drunk" and had a "loud" fight with her then-underage girlfriend (now wife) that lasted forty minutes, during which she "ripped a couple papers off the wall" and "stomped on the ground." She denied the fight was physical. The fight ended when J.D.'s girlfriend called her mother to pick her up. According to J.D., while she was escorting her girlfriend downstairs, Buckner came to his doorway and spoke to the couple. J.D.'s girlfriend asked Buckner

not to call the police to report the fight; Buckner agreed so long as J.D.'s girlfriend left.

¶ 10     After her girlfriend left, J.D. said she was trying to go back to her apartment when Buckner grabbed her, pulled her inside his apartment, and threw her to the couch.  J.D. testified to the various sexual acts Buckner forced on her, including forcing her to perform oral sex on him and forcing her to engage in vaginal and anal intercourse.  She said that Buckner's penis was erect when he was raping her and that he ejaculated multiple times.

¶ 11     The prosecution presented the testimony of a DNA analyst, who was able to verify that Buckner's DNA was found on J.D.'s vagina, labia, and neck.  The DNA analyst did not detect spermatozoa in the samples and was thus unable to verify that Buckner had ejaculated on or in J.D.

¶ 12     At trial, Buckner called two witnesses.  Buckner's ex-girlfriend testified that, in September 2015, he used a catheter every four days and was unable to "obtain an erection."  She further testified that Buckner had been unable to have an erection since he had surgery in 2010.

¶ 13   One of Buckner's friends testified that he was with Buckner for part of the evening on September 17. He said that Buckner was concerned about medication he had taken, was nauseated, and threw up a couple of times. He testified that, while he was in Buckner's apartment, he heard fighting in the apartment upstairs — including "[t]humping, falling, running." He said that two women knocked on Buckner's door and asked him not to call the police. Buckner's friend also testified that he left while Buckner was still standing in his doorway speaking to the women. As he passed the women on his way out, he observed "scars or bruising" and scratches on J.D.

¶ 14   In closing argument, Buckner's attorney argued that J.D. "got into a physical altercation in the upstairs apartment with [her girlfriend] on the evening in question, September 17, 2015." He argued that J.D. sustained "significant visible injuries" during the fight. Afterward, J.D. and Buckner had "some kind of consensual encounter" during which his DNA was transferred to her, but they did not have sexual intercourse because Buckner could not have an erection. Defense counsel argued that J.D. was motivated to lie about what took place that night because she "got beaten brutally

5

by her girlfriend" and "couldn't tell the truth" because her girlfriend was underage. J.D. feared her girlfriend "was very likely going to be arrested" for what happened that night.

¶ 15    After the second trial, the jury convicted Buckner of kidnapping and sexual assault.

## II.    Analysis

### A.    Prosecutorial Misconduct

¶ 16    Buckner contends that the district court plainly erred by allowing prosecutors to improperly (1) comment on his refusal to consent to a DNA test as evidence of his guilt and (2) pressure the jury to do justice for the victim. We conclude that both comments were obviously improper and that together they cast doubt on the reliability of the conviction, requiring reversal.

### 1.    Standard of Review and Generally Applicable Law

¶ 17    We engage in a two-step analysis when reviewing a claim of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we "must determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard of review." *Id.*

¶ 18    Closing argument may properly include the facts in evidence and the reasonable inferences drawn from those facts, as well as the law on which the jury has been instructed. *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005). A prosecutor must not "intentionally misstate the evidence or mislead the jury as to the inferences it may draw" from that evidence. *Id.* at 1049 (quoting ABA Standards for Crim. Just., Prosecution Function & Def. Function § 3-5.8 (3d ed. 1993) (hereinafter, ABA Standards)).

¶ 19    We acknowledge that a prosecutor must have "wide latitude in the language and presentation style used to obtain justice." *Id.* at 1048. But while a prosecutor is "free to strike hard blows," she "is not at liberty to strike foul ones." *Id.* (quoting *Wilson v. People*, 743 P.2d 415, 418 (Colo. 1987)). Indeed, "[w]hile a prosecutor can use every legitimate means to bring about a just conviction, she has a duty to avoid using improper methods designed to obtain an unjust result." *Id.* "Overzealous advocacy that undermines the quest for impartial justice by defying ethical standards cannot be permitted." *Id.*

¶ 20    Defense counsel did not object to the statements Buckner contends constitute prosecutorial misconduct. We review alleged

prosecutorial misconduct to which no contemporaneous objection was made for plain error. *Id.* at 1053. Plain error occurs only when an error is obvious and so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury's verdict. *Id.* "Only prosecutorial misconduct which is 'flagrantly, glaringly, or tremendously improper' warrants reversal." *Id.* (quoting *People v. Avila,* 944 P.2d 673, 676 (Colo. App. 1997)). If we find multiple instances of prosecutorial misconduct, we "must carefully review whether the cumulative effect of the prosecutor's statements so prejudiced the jury's verdict as to affect the fundamental fairness" of the trial. *Id.*

### 2. Refusal to Consent to a DNA Test

¶ 21 Buckner contends that the prosecutor improperly commented on his "refusal" to consent to a DNA test. We agree.

### a. Additional Background

¶ 22 After his arrest, Buckner voluntarily spoke with Detective Mary McIver for about thirty minutes in the jail. During the recorded conversation, the detective asked Buckner about consenting to a DNA test. Buckner was equivocal — he neither consented to nor refused a DNA test. Instead, he pondered aloud

8

how his DNA could be found on J.D. and, if it was found there, "is it [his] fault?" By the end of the conversation, the detective told Buckner that she would get a court order for the DNA test.

¶ 23    Ultimately, the prosecution secured a court order for a buccal swab from Buckner. As noted, Buckner's DNA was detected on swabs from J.D.'s vagina, labia, and neck.

¶ 24    In opening statement, the prosecutor focused on the importance of the DNA evidence, telling the jury, "We got his DNA . . . his DNA is inside her vagina, DNA on the outside of her vagina, DNA is on her anus."

¶ 25    During trial, without objection from defense counsel, the prosecutor elicited testimony that, pursuant to a court order for a buccal swab, an investigator with the District Attorney's Office had taken a saliva sample from Buckner in an interview room at the courthouse. The prosecutor also admitted the recorded conversation between Buckner and the detective into evidence for

the jury's consideration, again without a contemporaneous objection from Buckner.[2]

¶ 26     In closing argument, when arguing to the jury about why it should discount "Mr. Buckner's side" of the story, the prosecutor told the jury, "[Buckner] refuses to give his DNA sample to Detective McIver.  In fact, he gets visibly nervous, starts stuttering on the interview when she's asking about the DNA."  Defense counsel did not object.

b.     Right to Refuse to Consent to a Warrantless Search

¶ 27     By prohibiting unreasonable searches and seizures, the Fourth Amendment to the United States Constitution "necessarily grants to individuals the right to refuse warrantless entries and searches." *People v. Pollard*, 2013 COA 31M, ¶ 26.  A cheek swab or saliva sample to obtain DNA is a search subject to Fourth Amendment protections.  *See People v. Lancaster*, 2015 COA 93, ¶ 14.

---

[2] Before trial, Buckner moved to suppress his statements and all evidence gathered as a result of such statements as involuntarily given and a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The court denied the motion.

¶ 28    It is well settled that a person should not be penalized for exercising a constitutional privilege. *Pollard*, ¶ 25 (collecting cases). Thus, "a person's refusal to consent to a search may not be used by the prosecution — either through the introduction of evidence or by explicit comment — to imply the person's guilt of a crime." *Id.* at ¶ 32. "[T]he prosecution impermissibly 'uses' a person's refusal to consent to a search when it introduces evidence of the refusal, without having a proper purpose for admission of the evidence, *or* when it argues to the jury that such evidence is probative of guilt." *Id.* at ¶ 30. The prosecution may properly use evidence of a person's refusal to consent to a warrantless search for purposes other than to support an inference of guilt. *Id.* at ¶ 29.

### c.    Analysis

¶ 29    Buckner contends that it was improper for the prosecutor to "emphasize Buckner's guilt and/or consciousness of guilt based on his refusal to consent to a warrantless body search." We agree.

¶ 30    The People acknowledge that it would be improper for the prosecution to introduce evidence of, or urge an inference of guilt based on, a defendant's refusal to consent to a cheek swab. *See Pollard*, ¶ 28; *Lancaster*, ¶ 14. They argue, however, that

11

introduction of the challenged evidence and the prosecutor's comments about it could not have impermissibly penalized Buckner for exercising his constitutional right to refuse to consent to the cheek swab because Buckner never actually refused to consent.

¶ 31    True, during his conversation with the detective, Buckner neither agreed nor refused to submit to a DNA test. He asked questions. He appeared confused. He was equivocal.[3] At trial, however, the prosecutor unequivocally characterized Buckner's statements to the detective as a *refusal* to consent to the search. She said, "He refuses to give his DNA sample to Detective McIver."

¶ 32    During closing argument, a prosecutor may "point to different pieces of evidence and explain their significance within the case." *Domingo-Gomez*, 125 P.3d at 1048. Although arguments of counsel are not evidence, *People v. Rodriguez*, 914 P.2d 230, 278 (Colo. 1996), a prosecutor should not intentionally misstate the evidence

---

[3] On appeal, Buckner also contends that the district court plainly erred by admitting evidence that he did not voluntarily consent to have his DNA sample taken. Because Buckner did not clearly consent to or refuse the search, however, we doubt admission of the evidence constituted plain error. But we need not decide this question because we reverse based on how the prosecution mischaracterized and misused the evidence.

or mislead the jury as to the inferences it may draw from that evidence, *Domingo-Gomez*, 125 P.3d at 1049. Indeed, "[p]rosecutors have a higher ethical responsibility than other lawyers because of their dual role as both the sovereign's representative in the courtroom and as advocates for justice." *Id.* Because prosecutors represent the State and the People of Colorado, "their 'argument is likely to have significant persuasive force with the jury.'" *Id.* (quoting ABA Standards § 3-5.8 cmt.).

¶ 33 Under these circumstances, given the prosecutor's characterization of Buckner's conduct, it would have been reasonable for a juror to reach the suggested conclusion — that Buckner refused to consent to a DNA test — from the admitted evidence. We are not persuaded by the People's argument that Buckner's Fourth Amendment rights were not implicated because he "neither agreed to nor refused a DNA test."

¶ 34 The People next contend that the prosecution did not introduce or use evidence of Buckner's refusal to consent to the DNA test for an improper purpose. *See Pollard*, ¶ 29 (collecting cases where evidence of a refusal to consent to search was admitted for a proper purpose, including to impeach a defendant's assertion

13

that he did not live at a particular place, to rebut a claim of cooperation or self-defense, or to establish dominion or control over premises). They argue that Buckner's "sudden nervousness when asked about DNA testing indicated that his prior story was not truthful." We are not persuaded.

¶ 35     We acknowledge that the prosecutor did not expressly state that the jury should consider Buckner's refusal to consent to a DNA test as evidence of his guilt, but the prosecutor's use of refusal evidence may be improper even in the absence of such an overt statement. *See id.* at ¶ 31 ("The introduction of this type of evidence is erroneous, even if it is not accompanied by, or followed with, an explicit reference or comment relating it to the defendant's consciousness of guilt . . . ."). As the Ninth Circuit has explained, the prosecution's use of evidence that a defendant refused a search "can have but one objective to induce the jury to infer guilt." *United States v. Prescott*, 581 F.2d 1343, 1352 (9th Cir. 1978). The prosecutor can argue that, "if the defendant were not trying to hide something," they would have consented to the search. *Id.* "[W]hether the argument is made or not, the desired inference may

14

be well drawn by the jury." *Id.* This is why "the evidence is inadmissible in the case of refusal to let the officer search." *Id.*

¶ 36 Moreover, although prosecutors are generally permitted to comment on the demeanor of an individual during an interview, *see People v. Thames*, 2019 COA 124, ¶ 32, the prosecutor here did not simply argue to the jury that Buckner's "nervousness" meant his story was not credible; she specifically referenced his refusal to consent to give a DNA sample. *Cf. United States v. Clariot*, 655 F.3d 550, 555-56 (6th Cir. 2011) ("The exercise of a constitutional right, whether to refuse to consent to a search, to refuse to waive *Miranda* rights or to decline to testify at trial, is not evidence of guilt. And evidence of nervousness in the context of being asked to waive some of these rights is a weak, if indeed even legitimate, indicator of criminal behavior." (citing, among other cases, *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986), and *Florida v. Royer*, 460 U.S. 491, 507 (1983))).

¶ 37 The prosecutor did not reference Buckner's refusal to impeach or rebut a specific claim he made (e.g., that he cooperated with the investigation). The People contend that the refusal evidence suggested that Buckner was dishonest during his interview and

that the prosecutor properly argued the evidence that way. But, considering the facts of this case, the only "dishonesty" in Buckner's interview that could be impeached by his refusal to consent to a DNA test was his claim that he did not do what J.D. alleged. In other words, the only claim the refusal evidence impeached or rebutted was Buckner's claim that he was not guilty.

¶ 38 Considered in context, the prosecutor used Buckner's refusal to voluntarily provide a DNA sample to infer his guilty knowledge or consciousness of guilt, a prohibited purpose. *Pollard*, ¶ 28. Therefore we conclude that the prosecutor's statement was improper.

### 3. Justice for the Victim

¶ 39 Buckner contends that the prosecutor improperly asked the jury to do justice for the victim. We agree.

¶ 40 A prosecutor may not "pressure jurors by suggesting that guilty verdicts are necessary to do justice for a sympathetic victim." *People v. Marko*, 2015 COA 139, ¶ 221 (quoting *People v. McBride*, 228 P.3d 216, 223 (Colo. App. 2009)), *aff'd on other grounds*, 2018 CO 97; *see also United States v. Young*, 470 U.S. 1, 18 (1985) ("The prosecutor was also in error to try to exhort the jury to 'do its job';

16

that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice."); *cf. Domingo-Gomez*, 125 P.3d at 1049 ("The prosecutor should *not make arguments calculated to appeal to the prejudices of the jury*" and "should refrain from argument which would divert the jury from its duty to decide the case on the evidence." (quoting ABA Standards § 3-5.8)).

¶ 41  During rebuttal closing argument, referencing J.D., a different prosecutor argued, "Her day of justice is a long time coming.  That's today.  Hold him accountable for what he did to that girl that night."  Defense counsel did not object.  The prosecutor's plea for justice for J.D. was the last thing the jury heard before being instructed regarding the verdict forms and taken back to the jury room to begin deliberations.

¶ 42  A prosecutor may not pressure jurors to "do justice" for a victim.  The prosecutor's final statement to the jury in rebuttal closing argument did just that.  It was improper.

4.  The Improper Comments Require Reversal

¶ 43  Because Buckner's counsel did not object at trial, reversal is not warranted in the absence of plain error.  *Pollard*, ¶ 22.  Plain

error is both obvious and substantial. *Id.* at ¶ 24. Plain error is error that is "so clear-cut, so obvious, that a trial judge should be able to avoid it without benefit of objection." *Id.* at ¶ 39. For an error to be this obvious, it must contravene a clear statutory command, a well-settled legal principle, or Colorado case law. *Id.* at ¶ 40; *People v. Ujaama*, 2012 COA 36, ¶ 42. To be substantial, an error must so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Pollard*, ¶ 43.

¶ 44　　We first conclude that allowing the prosecutors' statements was obvious error. The first prosecutor's use of evidence that Buckner refused to consent to a DNA test was obviously improper because (1) a DNA test is a search, *Lancaster*, ¶ 14; (2) a person has the constitutional right to refuse to consent to a warrantless search, *Pollard*, ¶ 26; (3) it is "well settled" that a person cannot be penalized for exercising a constitutional privilege, *id.* at ¶ 25; and (4) the prosecution may not use evidence of a person's refusal to consent to a search to infer guilt, *id.* at ¶¶ 28, 30. The second prosecutor's statements to the jury saying that the victim's "day of justice" is "today" and imploring the jury to hold Buckner

accountable for "what he did to that girl that night" were obviously improper because a prosecutor may not "pressure jurors by suggesting that guilty verdicts are necessary to do justice for a sympathetic victim." *Marko*, ¶ 221 (quoting *McBride*, 228 P.3d at 223).

¶ 45 Having determined that allowing the prosecutors' statements was obvious error, we must next determine whether reversal is warranted. *Wend*, 235 P.3d at 1096.

¶ 46 We "review the combined prejudicial impact of the prosecutor's improper statements" to determine whether their cumulative effect "so prejudiced the jury's verdict as to affect the fundamental fairness" of Buckner's trial. *Domingo-Gomez*, 125 P.3d at 1053. "Factors to consider include the language used, the context in which the statements were made, and the strength of the evidence supporting the conviction." *Id.*; *see also Wend*, 235 P.3d at 1098 ("We focus on the cumulative effect of the prosecutor's statements using factors including the exact language used, the nature of the misconduct, the degree of prejudice associated with the misconduct, the surrounding context, and the strength of the other evidence of guilt."); *People v. Nardine*, 2016 COA 85, ¶ 65 (same).

And although "'[t]he lack of an objection may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging,' such deference must be tempered to allow an appellate court to correct particularly egregious errors." *Nardine*, ¶ 64 (quoting *People v. Rodriguez*, 794 P.2d 965, 972 (Colo. 1990)). "Ensuring fundamental fairness in trial is the beacon of plain error review." *Id.*

¶ 47    In *Pollard*, ¶¶ 18-47, a division of this court considered whether it was plain error to allow the prosecution to introduce evidence that the defendant did not allow police to search his car and then argue to the jury that it should infer guilt from that evidence. In closing argument, the prosecutor in that case argued to the jury, "And when you consider [the defendant telling police not to look in his car] your reason and common sense tells you what does he have to hide? Why not let him go in?" *Id.* at ¶ 21. Because the evidence against the defendant was "far from overwhelming" and because the prosecutor's improper comment on the defendant's refusal to consent to the search went directly to his theory of defense — that he did not knowingly possess the drugs in question — the division concluded that "the recurring references to

20

defendant's refusal to consent to the search, and the prosecution's explicit use of that evidence to imply guilty knowledge on his part, cast serious doubt on the reliability of his conviction, necessitating reversal for a retrial." *Id.* at ¶¶ 44, 47.

¶ 48    Similarly here, the evidence against Buckner was not overwhelming.  J.D. claimed that Buckner subjected her to hours of physical and sexual abuse, during which he held or repeatedly obtained an erection sufficient to engage in oral sex, vaginal intercourse, and anal intercourse, and ejaculated multiple times. Buckner's theory of the case was that J.D. had been physically assaulted by her girlfriend and that he and J.D. had some kind of consensual encounter thereafter that did not include intercourse. The indisputable physical evidence — the fact that Buckner's DNA was found on J.D. — was consistent with both stories.  Thus, the case hinged on credibility; to convict Buckner, the jury had to believe J.D.

¶ 49    The prosecutor's use of Buckner's refusal to consent to provide a DNA sample went directly to whether the encounter was consensual.  Buckner admitted he and J.D. had contact.  So, if the contact was consensual, why would Buckner not give up his DNA?

Why did the prosecution have to get a court order to collect it? What was he trying to hide? The prosecutor's comments on Buckner's refusal had but one objective: to induce the jury to infer guilt. *See Prescott,* 581 F.2d at 1352.

¶ 50 Aside from a consciousness of guilt improperly inferred from Buckner's refusal, the other affirmative evidence supporting only J.D.'s account was her physical injuries. The prosecution in the second trial relied on the fact that J.D. had been beaten to support its theory that what happened between J.D. and Buckner was a violent sexual assault rather than a consensual encounter. But J.D. admitted that she got into a fight with her girlfriend on the evening in question, although she denied it was a physical fight. And the first jury *acquitted* Buckner of the assault charges, suggesting it did not believe J.D. when she said Buckner was the one who beat her up, and *hung* on the sexual assault and kidnapping charges, suggesting the evidence on those counts was *not* overwhelming. The prosecution and defense proceeded on the same theories in the second trial.

¶ 51 J.D. also had credibility issues. She admittedly fabricated a detailed account of being abducted and assaulted in an alley and

told police and medical professionals that her physical injuries were caused by that attack. She was also impeached several times during her testimony at trial for giving details about the assault that were different from those to which she had previously testified under oath.

¶ 52 For his part, and although the jury was free to reject it, Buckner offered evidence corroborative of his defense, including testimony from his ex-girlfriend that he was incapable of getting or maintaining an erection and testimony from a friend who observed physical injuries on J.D. before she claimed Buckner assaulted her.

¶ 53 In sum, the evidence was not overwhelming.[4] And in such a case, the prosecutor's argument assumes greater significance and

---

[4] We are not persuaded by the People's argument that any error could not have been prejudicial because Buckner relied on the portion of his interview with the detective that he now argues was inadmissible. *Cf. People v. Pollard*, 2013 COA 31M, ¶¶ 34-38 (concluding that the defendant did not invite error by referencing and relying on improperly admitted evidence of his refusal to consent to a search). We have not (and need not have) determined whether admitting the evidence was erroneous; we have concluded that the prosecutor engaged in improper conduct by using the fact that Buckner did not voluntarily provide the detective with a DNA sample to infer consciousness of guilt. But even if the interview was admissible, and even if Buckner relied on the interview during trial, the prosecutor was obliged not to use the evidence to penalize

23

weighs more heavily on the jury's decision than it might otherwise. *See Domingo-Gomez*, 125 P.3d at 1055 (Bender, J., dissenting).

¶ 54    Although, for these reasons, we could conclude that the prosecutor's improper use of Buckner's refusal to consent to provide a DNA sample, by itself, warrants reversal under the plain error standard, we do not view such improper comments in isolation. *See id.* at 1054 (majority opinion) (requiring review of the cumulative effect of the prosecutor's improper statements). Recall that the last thing a prosecutor asked the jury to do before it began deliberating was to give the victim justice. The prejudice resulting from this statement likely was exacerbated by its timing. "Rebuttal closing is the last thing a juror hears from counsel before deliberating, and it is therefore foremost in their thoughts." *Id.* at 1052.

¶ 55    Because the outcome of the case depended on the jury's decision regarding whose story to believe, one prosecutor's misuse of Buckner's refusal to consent to a DNA test to infer his guilt combined with another prosecutor's plea to the jury to do justice for

---

Buckner for exercising a constitutionally protected right. *Id.* at ¶ 25.

the victim undermined the fundamental fairness of Buckner's trial and cast doubt on the reliability of the jury's verdict. Accordingly, we reverse his convictions for kidnapping and sexual assault and remand the case for retrial.

## B. Rape Shield Hearing

¶ 56 Buckner contends that the district court erred by denying his renewed motion for a rape shield hearing in advance of his second trial. We agree and address this contention as it is likely to arise on remand. *See People v. Stewart,* 2017 COA 99, ¶ 64 (J. Jones, J., concurring in part and dissenting in part) ("[O]ur common practice is to address contentions that pertain to issues likely to arise on remand. . . . [T]he interest in judicial efficiency demands that we do so.").

### 1. Standard of Review and Applicable Law

¶ 57 The purpose of Colorado's rape shield statute is to protect sexual assault victims from humiliating public fishing expeditions into their past sexual conduct. *People v. Cook,* 2014 COA 33, ¶ 36. To that end, the statute creates a presumption that evidence of an alleged victim's prior or subsequent sexual conduct is irrelevant to the criminal trial. § 18-3-407(1); *see People v. Weiss,* 133 P.3d

25

1180, 1185 (Colo. 2006). There are, however, several exceptions to this general rule. *See Weiss*, 133 P.3d at 1185-86.

¶ 58 As relevant here, the rape shield statute allows a defendant to offer "evidence that the victim . . . has a history of false reporting of sexual assaults" if the procedure outlined in the statute is followed. § 18-3-407(2); *Lancaster*, ¶ 36. Under this procedure, the moving party is required to file a written motion setting forth "an offer of proof of the relevancy and materiality" of the evidence. § 18-3-407(2)(a). The motion must be accompanied by an affidavit stating the offer of proof. § 18-3-407(2)(b).

¶ 59 An offer of proof typically states (1) what the anticipated testimony of the witness would be if the witness were permitted to testify; (2) the purpose and relevance of the testimony sought to be introduced; and (3) all the facts necessary to establish the testimony's admissibility. *Weiss*, 133 P.3d at 1186-87. It is a "preview of the evidence a party is prepared to introduce at an evidentiary hearing" and "consists of allegations that the party's attorney represents would be proven if the court granted the hearing." *People v. Marx*, 2019 COA 138, ¶ 46.

26

¶ 60     If the court finds that the offer of proof is sufficient, it must notify the other party of this finding.  § 18-3-407(2)(c).  If the prosecution stipulates to the facts in the offer of proof, then the court must rule on the motion based on the offer of proof without an evidentiary hearing.  *Id.*  Otherwise, the court must set the matter for an in camera hearing before trial.  *Id.*  At the conclusion of the hearing, if the court finds that the evidence proposed to be offered regarding the sexual conduct of the victim is relevant to a material issue in the case, it shall order that the evidence may be introduced and prescribe the nature of the evidence or questions to be permitted.  § 18-3-407(2)(e).

¶ 61     To warrant a hearing, the defendant's offer of proof must "articulate facts which, if demonstrated at the evidentiary hearing by a preponderance of the evidence, would show that the alleged victim made multiple prior or subsequent reports of sexual assault that were in fact false."  *Weiss*, 133 P.3d at 1182.  Proof by a preponderance of the evidence requires that the evidence must "preponderate over, or outweigh, evidence to the contrary."  *Marx*, ¶ 49 (quoting *City of Littleton v. Indus. Claim Appeals Off.*, 2016 CO 25, ¶ 38).  In the absence of such a showing, the evidence is

"irrelevant, immaterial, and inadmissible in the case at trial."
*Weiss*, 133 P.3d at 1189.

¶ 62   Although a defendant may offer more evidence at the hearing than that set forth in the offer of proof, the offer of proof itself must make the threshold showing.  In other words, if the defendant established only the facts alleged in the offer of proof at the evidentiary hearing, those facts must be sufficient to establish, by a preponderance of the evidence, that the alleged victim made multiple prior or subsequent false reports of sexual assault.

¶ 63   We review a trial court's determination of the admissibility of evidence under the rape shield statute for an abuse of discretion, but we review its interpretation of the rape shield statute de novo. *Id.*  A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or is based on an erroneous view of the law.  *People v. Osorio-Bahena*, 2013 COA 55, ¶ 21.

### 2.   Additional Background

¶ 64   Twenty-one days before his first trial, Buckner filed a motion requesting an evidentiary hearing to determine the admissibility of evidence that J.D. had a history of making false allegations of sexual assault.  In the motion, Buckner alleged that J.D. had made

"at least two false allegations of sexual assault," both of which were against J.B. — the father of J.D.'s daughter (who was born in 2008). The two alleged instances were that (1) J.D. falsely accused J.B. of sexually assaulting her on the occasion that her child was conceived, and (2) J.D. falsely accused J.B. of sexually assaulting her on a later occasion when J.B. visited J.D. at J.D.'s mother's house to spend time with their daughter.

¶ 65 The motion was accompanied by an affidavit signed by Buckner's attorney. With respect to the first allegedly false report, the affidavit attested that, among other things, J.D.'s mother had provided defense counsel with a recording of a telephone conversation between J.D. and her girlfriend wherein J.D. admitted that she falsely told several people that her daughter was conceived as a result of a sexual assault committed by J.B. when, in fact, J.D. and J.B. were in a relationship at the time and the sexual encounter was consensual. According to the affidavit, J.D. further admitted that she had concocted the story to prevent the girlfriend from being angry with her for being in a prior relationship with a man.

¶ 66 With respect to the second allegedly false report, the affidavit attested that J.B. had reported to defense counsel that he had consensual sex with J.D. one night while he was at J.D.'s mother's home visiting his daughter and that thereafter, in November 2014, J.D.'s girlfriend contacted him via Facebook and accused him of sexual assault. The affidavit relayed J.D.'s mother's observations about this incident as well, which corroborated J.B.'s report that the encounter was consensual.

¶ 67 Buckner's motion acknowledged that section 18-3-407(2) "generally requires a written motion to be filed at least thirty-five days prior to trial in order for the [c]ourt to consider admitting evidence governed by the Rape Shield statute," but it argued that good cause existed for the court to accept the untimely motion.

¶ 68 Five days before Buckner's first trial was scheduled to begin, the district court held a hearing on Buckner's untimely rape shield motion. The court allowed the parties to present argument but did not allow the parties to present evidence — specifically, the court invited the parties to address the issues of whether there was good cause for the late filing and whether Buckner had alleged *multiple* allegations of false reporting.

¶ 69    Following the hearing, the court concluded that there was not good cause for the late filing and that the affidavit attached to Buckner's motion was insufficient to establish more than one prior false report.  Specifically, the court did not view J.B.'s report that J.D.'s girlfriend had contacted him via Facebook in 2014 and accused him of sexual assault as "sufficient to establish a sufficient offer of proof with respect to any prior false report."  The court cited *Weiss* and clarified that a "history" of false reporting required more than one such false report.  The court denied Buckner's motion without further hearing and the case proceeded to trial.

¶ 70    Before the second trial, Buckner timely renewed his motion for a hearing under the rape shield statute and attached a new affidavit signed by his attorney.  With respect to the second allegedly false report, the second affidavit stated that the circumstances made clear that J.D. told her girlfriend that J.B. had assaulted her and that the girlfriend subsequently accused J.B. of sexual assault through Facebook messages.

¶ 71    The district court summarily denied the motion, stating that "[t]he motion was filed and denied in advance of the first trial in this matter.  The motion asserts no new grounds that would satisfy the

31

statutory criteria or cause the Court to reconsider its previous denial of the motion."

¶ 72 After the second jury convicted Buckner of kidnapping and sexual assault, Buckner filed a timely motion for a new trial pursuant to Crim. P. 33 in which he argued that the district court erred by denying his request for a rape shield hearing. The court summarily denied the motion for new trial.

### 3. Analysis

¶ 73 Buckner contends that the district court erred by denying him an evidentiary hearing on his rape shield motion. Specifically, he contends that the district court erred by concluding that his motion and affidavit did not sufficiently allege more than one false report of sexual assault. We agree.

¶ 74 To resolve this contention, we must first address a novel question of statutory interpretation. If the defendant follows the required procedure, the rape shield statute creates an exception to the general rule that a victim's sexual conduct is presumptively irrelevant for "evidence that the victim . . . has a history of false *reporting* of sexual assaults." § 18-3-407(2) (emphasis added). Because Buckner's motion did not allege that J.D. falsely reported

32

any prior sexual assault to "police or any other authority that might result in repercussions for J.B.," the People contend that Buckner failed to allege that J.D. falsely "reported" anything. In other words, the People contend that the allegedly false "report" must be made "to authorities" for it to qualify as "false reporting" under the rape shield statute. We disagree.

¶ 75     When interpreting statutes, our primary goal is to ascertain and give effect to the legislative intent. *People v. Sosa*, 2019 COA 182, ¶ 12. To do so, we look first at the language of the statute, giving words and phrases their plain and ordinary meanings if the language is clear and unambiguous. *Id.* In applying the plain meaning of a statute, we must give consistent effect to all its parts and construe each provision in harmony with the overall statutory design. *Id.* at ¶ 13. When a statutory term is undefined, we construe it in accordance with its ordinary meaning. *Id.*

¶ 76     Section 18-3-407(2) states simply that "evidence that the victim . . . has a history of false reporting of sexual assaults" may be admissible if the defendant satisfies the statutory procedures. The statute does not mandate that such reports be made to "law enforcement" or to "the authorities." It does not specify to whom

the allegedly false report must be made.  "[W]e respect the legislature's choice of language, and we do not add words to or subtract words from a statute."  *People ex rel. Rein v. Meagher*, 2020 CO 56, ¶ 22.  And we note that, if the General Assembly had intended that only formal reports to law enforcement agencies be considered when evaluating whether a victim "has a history of false reporting" it could have made that intention clear, as it has in other contexts.  *See, e.g.*, § 16-2.7-102(1), C.R.S. 2021 ("Any person . . . may make a missing person report to a law enforcement agency."); § 18-1-711(1)(a), C.R.S. 2021 (providing immunity to any person who "reports in good faith an emergency drug or alcohol overdose event to a law enforcement officer, to the 911 system, or to a medical provider"); § 18-6.5-108(1)(a), C.R.S. 2021 (requiring a person who observes the mistreatment of an at-risk elder to "report such fact to a law enforcement agency").

¶ 77     The term "reporting" is not defined in the statute.  Courts may refer to dictionary definitions to determine the plain and ordinary meaning of undefined statutory terms.  *People v. Serra*, 2015 COA 130, ¶ 52.  The dictionary defines "report" to include, among other things, "a written or spoken description of a situation, event, etc.,"

34

"a usually detailed account," or "an account spread by common talk." Merriam-Webster Dictionary, https://perma.cc/8ME4-D8HQ. This common definition contains no requirement that a "report" be made to a particular audience or recipient.

¶ 78    In the absence of a clear directive from the General Assembly that a victim's "history of false reporting" for purposes of the rape shield statute be limited to only those false reports made to law enforcement or other "authorities," we decline to engraft such a limitation.

¶ 79    The People appear to concede that, if a victim's comments during a "private conversation" can be considered a "report" for purposes of the rape shield statute, then Buckner's offer of proof sufficiently demonstrated one instance of allegedly false reporting (when J.D.'s daughter was conceived). The affidavit alleged that J.D.'s mother provided defense counsel with a recording of a conversation during which J.D. admitted to her girlfriend that "she had falsely told several people that her daughter . . . was conceived as a result of a sexual assault committed by [J.B.] when, in reality, the two were in a relationship and the sexual encounter was consensual." We conclude that the facts alleged in the offer of

proof, if established at the hearing by a preponderance of the evidence, would be sufficient to prove this first instance of alleged false reporting.

¶ 80     But the People argue that the district court correctly concluded that Buckner failed to sufficiently demonstrate a second instance of allegedly false reporting (regarding the night at J.D.'s mother's house). Specifically, the People argue that Buckner presented no evidence that J.D. was the person who made the second allegedly false report and that it was unclear whether J.D.'s girlfriend's messages to J.B. referred to the first allegedly false report or the second allegedly false report. Based on the facts alleged in the second affidavit, however, we disagree.

¶ 81     The affidavit alleged that defense counsel had spoken with J.B., who reported that he had consensual sex with J.D. one night while he was at J.D.'s mother's home visiting his daughter. The affidavit also alleged that J.D.'s mother reported that J.B. had visited the residence to spend time with his daughter and ended up spending the night. J.D.'s mother reported observing J.B. and J.D. "lying in bed together, close together, 'spooning' with one another" and that J.D. "gave no indication anything out of the ordinary had

36

occurred the previous night." The affidavit alleged that, after the visit, in November 2014, J.D.'s girlfriend contacted J.B. via Facebook and accused him of sexual assault. The affidavit also stated that the circumstances surrounding J.B.'s overnight stay with J.D. at her mother's house, followed by J.D.'s girlfriend's Facebook accusations, "make clear that [J.D.] told [her girlfriend] that J.B. had assaulted her, and that [the girlfriend] subsequently accused J.B. of sexual assault through Facebook messages."

¶ 82 From this evidence it would be reasonable to infer that (1) J.D.'s girlfriend's Facebook accusations referred to the alleged sexual assault on the night J.B. visited his daughter and stayed with J.D. (rather than referring to an incident alleged to have occurred over six years earlier), and (2) J.D. was the person who told her girlfriend she had been sexually assaulted on that occasion.

¶ 83 We acknowledge that the evidence described in the affidavit was circumstantial, rather than direct. *See* COLJI-Crim. D:01 (2020) (defining circumstantial evidence as indirect evidence "based on observations of related facts that may lead you to reach a conclusion about the fact in question"). But in determining the

sufficiency of evidence, the law makes no distinction between direct and circumstantial evidence. *People v. Bennett*, 183 Colo. 125, 131, 515 P.2d 466, 469 (1973); *People v. Medina*, 51 P.3d 1006, 1013 (Colo. App. 2001)*, aff'd sub nom. Mata-Medina v. People*, 71 P.3d 973 (Colo. 2003).

¶ 84    In addition, that the facts may be disputed or may lead to other reasonable inferences is of no consequence at this stage. The rape shield statute makes clear that if the offer of proof is sufficient and if the prosecution does not stipulate to the facts contained in the offer of proof, "the court *shall* set a hearing to be held in camera prior to trial." § 18-3-407(2)(c) (emphasis added).

¶ 85    Although it is a close call, we conclude that the facts described in the affidavit — if proved by a preponderance of the evidence at a hearing — would be sufficient to establish multiple instances of false reporting. *See Weiss*, 133 P.3d at 1184. Thus, we conclude that the district court erred by denying Buckner a hearing on his motion.

¶ 86    By so concluding, however, we do not intend to minimize what must be shown by an offer of proof to justify a hearing. Courts should remain mindful of the purpose of the rape shield statute to

protect victims of sexual assault "from humiliating and public exposure of intimate details of their lives absent a 'preliminary showing that evidence thus elicited will be relevant to some issue in the pending case.'" *Marx*, ¶ 41 (quoting *People v. McKenna*, 196 Colo. 367, 371-72, 585 P.2d 275, 278 (1978)).

## III.   Conclusion

¶ 87    The judgment of conviction is reversed and the case is remanded for a new trial.  If Buckner renews his motion to admit evidence that J.D. has a history of false reporting of sexual assaults based on the same offer of proof, the district court shall conduct an evidentiary hearing under section 18-3-407(2) to determine whether such evidence is admissible.

JUDGE LIPINSKY concurs.

JUDGE FURMAN concurs in part and dissents in part.

JUDGE FURMAN, concurring in part and dissenting in part.

¶ 88    The majority concludes that the combined prejudice of the prosecutor (1) stating that Buckner refused to voluntarily provide DNA and (2) asking for justice for the victim during closing remarks requires reversal under a plain error standard.  I disagree that these brief statements whether considered individually or cumulatively "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *See Hagos v. People*, 2012 CO 63, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).  Therefore, I respectfully dissent from this portion of the majority's opinion.  In all other respects, I concur.

I.    The Evidence at Trial

¶ 89    During an interview, a detective asked Buckner if he would take a DNA test.  She briefly explained how DNA worked and what it could show in his case.  The detective then told Buckner that she might seek a court order for a DNA test and, before he gave her a definitive answer as to whether he would submit to testing, she told him, "[W]e'll go ahead and do it that way."

40

## II. The Prosecutor's Closing Argument

¶ 90    During closing argument, the prosecutor made these comments (among others):

> Let's look at two sides to the story. Let's look at the two sides. You heard -- we've gone through [J.D.'s] side. Let's look at [Buckner's] side. He denies any type of sexual contact whatsoever with [J.D.].
>
> The detective was very clear with him; you've heard and seen that video statement. She was very clear. Detective: You didn't have any kind of sexual intercourse with her? Defendant: I didn't do this to this girl. Detective: She's saying you're the person that did this -- did that; that it was against her will. Defendant: No. Detective: She's saying that you raped her with force while beating her up. Defendant: See, I didn't do that. He denies [she] was even in [his] apartment.
>
> Detective: Did she ever come into your apartment that night? Defendant: The apartment is small. Detective: No. I mean, like, into your apartment, like into your bedroom at all. Defendant: Come on, Man. Detective: I'm asking you because this is stuff she's telling me. Defendant: No. That's a lie.
>
> *He refuses to give his DNA sample to [the detective]. In fact, he gets visibly nervous, starts stuttering on the interview when she's asking about the DNA.* He didn't give enough information to her for her to be able to contact [J.D.'s friend]. And, in fact, [J.D.'s friend] never contacted the detective.

41

(Emphasis added.)

### III. Defense Counsel's Closing Argument

¶ 91    During closing argument, defense counsel made these comments (among others):

> Upstairs, in the upstairs apartment directly above [Buckner] were [J.D.] and [J.D.'s girlfriend].
>
> They got into a fight. And they got into a fight that wasn't simply a verbal argument. It wasn't simply a verbal argument where pictures got pulled off the wall, some stomping, but a full-on domestic violence altercation in which [J.D.] got beat up.
>
> [J.D.] and [J.D.'s girlfriend] then came downstairs. The decision got made between the two of them -- [J.D.'s girlfriend] was leaving. They came downstairs. They knocked on that door; and when Mr. Buckner answered, they asked Mr. Buckner, Please, please do not call the police. Don't call the police.
>
> And [Buckner] didn't want to call the police. He had no interest in involving law enforcement. He definitely did want [J.D.] to get out of there. He wanted [J.D.] to leave because she was beating up her girlfriend, and there's an altercation going on upstairs.
>
> So whether he encouraged or not, he stepped in and [J.D.'s girlfriend] left. Then he and [J.D.] are alone together. And at some point,

she comes back into his apartment, whether she was in his apartment on that evening or some other occasion, got the information about some of the contents of the apartment. We don't necessarily know. But she -- they were hanging out alone together.

She had been drinking, per her own admission. And at some point, she starts hugging up on him or some kind of a consensual encounter in which his DNA gets on her. That's what took place. It was short of any form of sexual intercourse; that we know that [Buckner] cannot get an erection. And it certainly wasn't the violent attack that's been described.

Now, when we talk about [Buckner's] story, I want to direct your attention to all of the things, because the district attorney read some portions of the transcript of [Buckner's] videotaped interview with the detective -- . . . , who is seated over in the courtroom -- read some portions of the transcript. What I want you to do when you go back to deliberate, I want you to watch that video again. And I want you to watch a couple of things very closely.

Remember this is taking place -- this interview is taking place the following week after this incident supposedly occurred. And remember that the interview didn't happen because [the detective] came downstairs, came to [Buckner], said, Hey, I want to speak with you. Will you please speak with me? The interview happened because [Buckner] went to her. He wanted to talk to her because he didn't know

why he was even in there.  He didn't understand why he was in jail.

## IV.    Rebuttal Closing Argument

¶ 92    During rebuttal closing argument, the prosecutor made these comments (among others):

> You guys determine what the facts are.  We can stand up here and repeat over and over the testimony that you've already heard, give you our opinions on what we think the facts are, but it's irrelevant.  It's your job to determine what the facts are.
>
> You've heard [J.D.] tell you what happened on September 17th, and you heard his version of events.  You can believe all of it, you can believe part of it or you can believe none of it.  Right.  That's what the judge told you in his instructions.  If you believe what [J.D.] told you, [Buckner] is guilty of kidnapping and he's guilty of sexual assault.
>
> They want you to take a good long, hard look at [Buckner's] statements.  It's your evidence, but their argument is that [Buckner] is here because [J.D.'s girlfriend] assaulted [J.D.].
>
> . . . .
>
> And that proof, ladies and gentlemen, is in the DNA.  The thing about DNA, it doesn't choose sides.  It doesn't change its story.  It doesn't forget details.  You don't have to believe in it for it to be true.

> *Her day of justice is a long time coming.* That's
> today. Hold him accountable for what he did
> to that girl that night.

(Emphasis added.)

## V. Analysis

¶ 93 Our supreme court in *Hagos*, ¶ 23, stated that "[p]lain error review allows the opportunity to reverse convictions in cases presenting particularly egregious errors, but reversals must be rare to maintain adequate motivation among trial participants to seek a fair and accurate trial the first time." "Because this standard was formulated to permit an appellate court to correct 'particularly egregious errors,' *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987), the error must impair the reliability of the judgment of conviction to a greater degree than under harmless error to warrant reversal." *Hagos*, ¶ 14; *see id.* at ¶ 12 (explaining that reversal is required under the harmless error standard only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings" (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986))). Reversing for prosecutorial misconduct in this case could blur the distinction between the plain error and harmless error standards. *See id.* at ¶¶ 12, 14.

¶ 94　　I conclude that these brief statements during closing arguments — (1) regarding Buckner's refusal to voluntarily provide DNA and (2) requesting justice for the victim — did not affect the fundamental fairness of the proceedings to the degree required by plain error.  *See id.* at ¶ 14; *see also People v. Sepeda*, 196 Colo. 13, 25, 581 P.2d 723, 732 (1978) ("[W]e have held on numerous occasions that prosecutorial misconduct in closing arguments rarely, if ever, is so egregious as to constitute plain error, within the meaning of Crim. P. 52(b) . . . .").

## A.　　Refusal to Provide DNA

¶ 95　　Any purported refusal by Buckner to give DNA had little value to a disputed issue at trial.  Buckner's theory of defense was that the contact was consensual.  And the jury heard evidence from the detective that Buckner appeared to be cooperative with the DNA testing.  Our case, therefore, is unlike *People v. Pollard*, where the prosecutor's improper comment on the defendant's refusal to consent to a search went directly to the theory of defense.  2013 COA 31M, ¶ 47.

¶ 96　　The prosecutor's comments were brief.  And our supreme court has held that "[c]omments that were 'few in number,

momentary in length, and were a very small part of a rather prosaic summation' do not warrant reversal under the plain error standard." *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005) (quoting *People v. Mason*, 643 P.2d 745, 753 (Colo. 1982)).

¶ 97 And, before closing arguments, the trial court instructed the jurors that they must "not allow bias" to influence their decision, and that the burden of proof is on the prosecution to prove "beyond a reasonable doubt the existence of all the elements necessary to constitute the crime charged." *See People v. Reed*, 2013 COA 113, ¶ 28. I presume the jury understood and followed these instructions.

### B. Justice for the Victim

¶ 98 The very brief reference to justice for the victim was not so inflammatory or evocative of the jury's sympathy as to cast serious doubt on the reliability of the judgment or undermine the fundamental fairness of the proceedings. *See Hagos*, ¶ 12.

¶ 99 This was not pervasive misconduct. *See People v. Nardine*, 2016 COA 85, ¶ 65; *see also Wend v. People*, 235 P.3d 1089, 1098 (Colo. 2010) ("We focus on the cumulative effect of the prosecutor's statements using factors including the exact language used, the

nature of the misconduct, the degree of prejudice associated with the misconduct, the surrounding context, and the strength of the other evidence of guilt.").

¶ 100 And the timing of this statement at the very end of rebuttal argument seems to support the implication that the absence of a defense objection reflects that the defense counsel did not think that this statement was overly damaging. *See People v. Rodriguez,* 794 P.2d 965, 972 (Colo. 1990) ("The lack of an objection may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." (quoting *Brooks v. Kemp,* 762 F.2d 1383, 1397 n.19 (11th Cir. 1985))). Buckner had given his closing argument, and the last few statements of rebuttal are similarly prominent in the mind of the listening defense counsel as they are in the mind of the jury.

¶ 101 In summary, I don't think the two brief statements made by the prosecutor during closing arguments "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos,* ¶ 14 (quoting *Miller,* 113 P.3d at 750). In my view, therefore, this is not

the rare case of plain error that our supreme court determined

warrants reversal.  *See Wend*, 235 P.3d at 1098.